[No. 81719-7. En Banc.]

Argued September 17, 2009.     Decided December 10, 2009.

THE STATE OF WASHINGTON, *Respondent*, v. DUSTIN WARREN HARRINGTON, *Petitioner*.

---

*Susan M. Gasch* (of *Gasch Law Office*), for petitioner.

*Andrew K. Miller, Prosecuting Attorney*, and *Adrienne M. Farabee, Deputy*; and *Scott W. Johnson* (of *Mendoza Law Office, PS*), for respondent.

*Douglas B. Klunder* on behalf of American Civil Liberties Union of Washington, amicus curiae.

¶1 SANDERS, J. — Law enforcement officers arrested petitioner Dustin Warren Harrington after patting him down and finding a glass pipe in his pocket. The State contends the search was consensual and flowed from a valid social contact. Harrington asserts police officers unconstitutionally seized him, violating his rights under the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution. The trial court denied his motion to suppress the evidence, and the Court of Appeals affirmed.

¶2 We conclude the officers' actions, when viewed cumulatively, impermissibly disturbed Harrington's private affairs without authority of law and therefore constituted an unlawful seizure. Article I, section 7 cannot tolerate the officers' progressive intrusion into Harrington's privacy. We reverse the Court of Appeals, suppress the evidence against Harrington, and dismiss.

## FACTS

¶3 At roughly 11:00 p.m. on August 13, 2005, Richland Police Officer Scott Reiber was driving his marked patrol car north on Jadwin Avenue in Richland. Reiber noticed Harrington walking south along the sidewalk. Reiber made a U-turn, drove south past Harrington, and pulled into a driveway. The officer did not activate his lights or siren. Reiber exited his patrol car and approached Harrington who was then walking toward the officer. Reiber testified he "contact[ed]" Harrington because "[t]hat area, late at night, a gentleman walking – social contact. See what he was up to, just to talk." Verbatim Report of Proceedings (VRP) at 11-12.

¶4 When close enough, Reiber asked, "Hey, can I talk to you" or "Mind if I talk to you for a minute?" *Id.* at 13.

Harrington replied either "Yeah" or "Yes." *Id*. The two men began a conversation, standing approximately five feet apart. Reiber positioned himself off the sidewalk on the grass. Reiber testified Harrington's path was not obstructed by either Reiber or the patrol car. Reiber asked Harrington where he was coming from. Harrington responded he was coming from his sister's house. Asked where his sister lived, Harrington replied he did not know. Reiber considered that lack of knowledge "a little suspicious." *Id*. at 14. Reiber testified Harrington was acting "quite nervous, pretty fidgety" throughout the encounter. *Id*. at 15. Reiber also noticed bulges in Harrington's pockets. Early in the encounter Harrington put his hands into his pockets, prompting Reiber to ask Harrington to remove his hands. Harrington took his hands out when initially asked but repeatedly put his hands back into his pockets before quickly removing them again. Their conversation lasted between two and five minutes.

¶5 During that time frame Washington State Patrol Trooper William Bryan coincidentally drove south past the encounter. After noticing an officer speaking alone with an individual, Bryan made a U-turn and parked his marked patrol car in the northbound lane of traffic, approximately 10 to 30 feet from Harrington and Reiber. Bryan exited his car and stood 7 or 8 feet from Harrington. Bryan did not speak to either Harrington or Reiber. When testifying Bryan could not recall whether he activated any pattern of lights when he made the U-turn or when he parked his car in the lane.

¶6 After Bryan appeared Reiber asked if he could pat down Harrington for officer safety. Reiber told Harrington he was not under arrest at that moment. Harrington answered, "Yeah." *Id*. at 15. During the pat down Reiber felt a hard, cylindrical object in Harrington's front right pocket. Reiber asked what it was, to which Harrington responded, "My glass." *Id*. at 16. Asked for clarification, Harrington added, "My meth pipe." *Id*. at 16-17. Reiber then told Harrington he was under arrest. Incident to arrest the

officers searched Harrington and discovered a pipe and baggie. Both contained methamphetamine.

¶7 Harrington agreed to a bench trial on stipulated facts. Defense counsel moved to suppress the evidence based on illegal seizure. After hearing testimony from both Reiber and Bryan, the trial court denied Harrington's suppression motion. The Benton County Superior Court found Harrington guilty of unlawful possession of a controlled substance—methamphetamine. Harrington appealed to the Court of Appeals, which affirmed the conviction by a two-to-one vote, over a forceful dissent by Judge Dennis J. Sweeney. *State v. Harrington*, 144 Wn. App. 558, 183 P.3d 352 (2008).

## ISSUE

Whether the encounter between Harrington and the police officers rose to an unconstitutional seizure prior to arrest, in violation of article I, section 7 of the Washington Constitution, requiring suppression of drugs found on his person.

## STANDARD OF REVIEW

■ ¶8 Whether police have seized a person is a mixed question of law and fact. *State v. Armenta*, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997). " 'The resolution by a trial court of differing accounts of the circumstances surrounding the encounter are factual findings entitled to great deference,' but 'the ultimate determination of whether those facts constitute a seizure is one of law and is reviewed de novo.' " *Id.* (quoting *State v. Thorn*, 129 Wn.2d 347, 351, 917 P.2d 108 (1996), *overruled on other grounds by State v. O'Neill*, 148 Wn.2d 564, 62 P.3d 489 (2003)).

## ANALYSIS

Unlawful disturbance of private affairs

■ ■ ¶9 Article I, section 7 of our state constitution grants greater protection to individual privacy rights than the Fourth Amendment.[1] *See, e.g., State v. Rankin,* 151 Wn.2d 689, 694, 92 P.3d 202 (2004); *O'Neill,* 148 Wn.2d at 584; *State v. Jones,* 146 Wn.2d 328, 332, 45 P.3d 1062 (2002).[2] Article I, section 7 provides, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." The text focuses on disturbance of private affairs, which casts a wider net than the Fourth Amendment's protection against unreasonable search and seizure. Because searches and seizures incontrovertibly disturb private affairs, article I, section 7 envelops search and seizure.

■ ¶10 Pursuant to article I, section 7, seizure occurs when "considering all the circumstances, an individual's freedom of movement is restrained and the individual would not believe he or she is free to leave or decline a request due to an officer's use of force or display of authority." *Rankin,* 151 Wn.2d at 695 (citing *O'Neill,* 148 Wn.2d at 574). The standard is "a purely objective one, looking to the actions of the law enforcement officer . . . ." *State v. Young,* 135 Wn.2d 498, 501, 957 P.2d 681 (1998).[3] The relevant question is whether a reasonable person in the individual's position would feel he or she was being detained. *O'Neill,* 148 Wn.2d at 581. An encounter between a citizen and the police is consensual if a reasonable person under the circumstances would feel free to walk away. *United States v.*

---

[1] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. amend. IV.

[2] Due to this well-established principle we need not engage in a *State v. Gunwall,* 106 Wn.2d 54, 720 P.2d 808 (1986), analysis.

[3] The "purely objective" standard articulated in *Young* rejected the Fourth Amendment seizure test, which contains a subjective element. *See California v. Hodari D.,* 499 U.S. 621, 626, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991).

*Mendenhall,* 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980).

■■ ¶11 In *Young* we embraced a nonexclusive list of police actions likely resulting in seizure: " 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.' " *Young,* 135 Wn.2d at 512 (quoting *Mendenhall,* 446 U.S. at 554-55). " 'In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.' " *Id.* Harrington bears the burden of proving a seizure occurred in violation of article I, section 7. *Id.* at 510.

■■ ¶12 If police unconstitutionally seize an individual prior to arrest, the exclusionary rule calls for suppression of evidence obtained via the government's illegality. *See State v. Garvin,* 166 Wn.2d 242, 254, 207 P.3d 1266 (2009). " 'The exclusionary rule mandates the suppression of evidence gathered through unconstitutional means.' " *Id.* (quoting *State v. Duncan,* 146 Wn.2d 166, 176, 43 P.3d 513 (2002)).

a. Social contact

¶13 Washington courts have not set in stone a definition for so-called social contact. It occupies an amorphous area in our jurisprudence, resting someplace between an officer's saying "hello" to a stranger on the street and, at the other end of the spectrum, an investigative detention (i.e., *Terry* stop). *See generally Terry v. Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). The phrase's plain meaning seems somewhat misplaced. "Social contact" suggests idle conversation about, presumably, the weather or last night's ball game—trivial niceties that have no likelihood of triggering an officer's suspicion of criminality. The term "social contact" does not suggest an investigative component.

¶14 However its application in the field—and in this court—appears different. For example we have categorized

interactions where officers ask for an individual's identification as social contact. *See Young,* 135 Wn.2d at 511. "Article I, section 7 does not forbid social contacts between police and citizens: '[A] police officer's conduct in engaging a defendant in conversation in a public place and asking for identification does not, alone, raise the encounter to an investigative detention.' " *Id.* (alteration in original) (quoting *Armenta,* 134 Wn.2d at 11); *see also State v. Belanger,* 36 Wn. App. 818, 820, 677 P.2d 781 (1984) ("[N]ot every public street encounter between a citizen and the police rises to the stature of a seizure. Law enforcement officers do not 'seize' a person by merely approaching that individual on the street or in another public place, or by engaging him in conversation."). In *Young* we found effective law enforcement techniques not only require passive police observation, but also necessitate interaction with citizens on the streets.

¶15 Here Reiber described his initial interaction with Harrington as a social contact. Reiber did not activate his police emergency lights or siren. His patrol car was not in sight. Reiber approached Harrington on foot and asked whether he could talk to Harrington. Harrington consented to speak with the officer without duress or compulsion. During the conversation Reiber allowed Harrington freedom to use the sidewalk. Reiber did not otherwise block Harrington's egress from the site. Under existing law Reiber's initial actions did not rise to the level of seizure. Analyzing this encounter under Washington's purely objective standard, a reasonable person at the beginning of the conversation would not have thought Reiber restrained that person's freedom of movement.[4]

---

[4] But see a recent empirical study published by Northwestern University Law School's *Journal of Criminal Law and Criminology.* David K. Kessler, *Free to Leave? An Empirical Look at the Fourth Amendment's Seizure Standard,* 99 J. CRIM. L. & CRIMINOLOGY 51 (2009). Noting that "people feel compelled to comply with authority figures," *id.* at 62, the study of 406 respondents found that "most people would not feel free to leave when they are questioned by a police officer on the street . . . ." *Id.* at 73.

¶16 Subsequent events quickly dispelled the social contact, however, and escalated the encounter to a seizure.

b. Arrival of second police officer

¶17 In *Young* we embraced a nonexclusive list of police actions likely resulting in seizure, including " 'the threatening presence of several officers.' " *Young*, 135 Wn.2d at 512 (quoting *Mendenhall*, 446 U.S. at 554). While we have never squarely addressed the number of officers necessary to constitute a threatening presence under *Mendenhall*, other jurisdictions have found the factor difficult to meet in circumstances similar to Harrington's. *See, e.g.*, *People v. Robinson*, 391 Ill. App. 3d 822, 909 N.E.2d 232, 243, 330 Ill. Dec. 519 (2009) (applying *Mendenhall* factors, the Appellate Court of Illinois concluded three officers standing next to suspect did not constitute a seizure); *United States v. Jones*, 523 F.3d 1235, 1237, 1242 (10th Cir. 2008) (no seizure when one officer spoke with suspect while three other officers hovered nearby); *United States v. Buchanon*, 72 F.3d 1217, 1224 (6th Cir. 1995) (arrival of three additional officers, with emergency lights blazing, minutes after initial traffic stop was a threatening presence, but without additional *Mendenhall* factors the threatening presence alone could not create a seizure).

¶18 Bryan arrived a few minutes after the initial contact. He did not communicate with either Harrington or Reiber. Instead Bryan stood seven or eight feet away from the duo. Bryan was the only other officer to arrive. Harrington undoubtedly noted Bryan's presence. A second officer's sudden arrival at the scene would cause a reasonable person to think twice about the turn of events and, for this reason, Bryan's presence contributed to the eventual seizure of Harrington.

c. Request to remove hands from pockets

¶19 The progressive intrusion into Harrington's privacy snowballed quickly after Bryan's arrival. Lower courts in Washington have found an officer's request to keep hands

out of one's pockets does not independently rise to the level of a seizure. *See State v. Nettles*, 70 Wn. App. 706, 712, 855 P.2d 699 (1993). The *Nettles* court found that asking a person to remove his hands from his pockets was no more intrusive than asking for identification. *Id.* Elsewhere, directing an individual to merely remove hands from pockets has been held to fall short of a seizure. *See, e.g., Duhart v. United States*, 589 A.2d 895, 898 (D.C. 1991) (When officer approached defendant on street, asked him to take his hand out of his pocket, and, when defendant reluctantly complied, officer grabbed his wrist, no seizure occurred until officer grabbed defendant's wrist. The request that defendant remove hands from pockets constituted "merely a pre-seizure consensual encounter."); *United States v. Barnes*, 496 A.2d 1040, 1044-45 (D.C. 1985) (no seizure where officer asked defendant to remove hands from pockets and then asked him two questions, because this was no more intrusive than asking for identification).

¶20 Nonetheless, asking a person to perform an act such as removing hands from pockets adds to the officer's progressive intrusion and moves the interaction further from the ambit of valid social contact, particularly if the officer uses a tone of voice not customary in social interactions. *See Young*, 135 Wn.2d at 512 (seizure may result from " 'use of language or tone of voice indicating that compliance with the officer's request might be compelled' " (quoting *Mendenhall*, 446 U.S. at 554-55)). Reiber concedes he asked Harrington to remove his hands from his pockets in order "to control Mr. Harrington's actions." VRP at 21.

d. Request to frisk

¶21 A nonconsensual "protective frisk for weapons" is warranted when a "reasonable safety concern exists . . . when an officer can point to 'specific and articulable facts' which create an objectively reasonable belief that a suspect is 'armed and presently dangerous.' " *State v. Collins*, 121 Wn.2d 168, 173, 847 P.2d 919 (1993) (quoting *Terry*, 392 U.S. at 21-24). The officer need not be absolutely certain the

individual is armed, only that a reasonably prudent person in the same circumstances would be warranted that their safety, or that of others, was in danger. *Id*. In *State v. Belieu*, 112 Wn.2d 587, 773 P.2d 46 (1989), we articulated the principle differently: "[C]ourts are reluctant to substitute their judgment for that of police officers in the field. 'A *founded suspicion* is all that is necessary, *some basis from which the court can determine that the detention was not arbitrary or harassing.*' " *Id*. at 601-02 (first emphasis added) (quoting *Wilson v. Porter*, 361 F.2d 412, 415 (9th Cir. 1966)). A nonconsensual investigative detention is a seizure, albeit a legal intrusion if proper safeguards are met. *See Garvin*, 166 Wn.2d at 250.

¶22 The reasoning in *State v. Soto-Garcia*, 68 Wn. App. 20, 841 P.2d 1271 (1992), *abrogated on other grounds by Thorn*, 129 Wn.2d 347, persuades us that a series of police actions may meet constitutional muster when each action is viewed individually, but may nevertheless constitute an unlawful search or seizure when the actions are viewed cumulatively. In *Soto-Garcia*, Kelso Police Officer Kevin Tate performed a social contact with Marcelo Soto-Garcia as the latter walked out of an alley. Soto-Garcia approached Tate's patrol car when the officer pulled to the side of the road. Tate asked Soto-Garcia where he was coming from and where he was going. Tate asked for Soto-Garcia's name, in response to which Soto-Garcia produced identification. Tate ran identification and warrant checks in Soto-Garcia's presence. When the checks came back clean, Tate asked if Soto-Garcia had any cocaine on his person. Soto-Garcia denied having cocaine. Tate then asked if he could search Soto-Garcia, who replied, " 'Sure, go ahead.' " *Id*. at 22. Tate reached into Soto-Garcia's shirt pocket and discovered cocaine.

¶23 The *Soto-Garcia* court held Tate's combined acts aggregated to seize Soto-Garcia. "The atmosphere created by Tate's progressive intrusion into Soto-Garcia's privacy was of such a nature that a reasonable person would not believe that he or she was free to end the encounter." *Id*. at

25. The court then inquired whether Soto-Garcia's subsequent consent to search was valid in light of the prior illegal seizure, answering in the negative. *Id.* at 26-27. "Soto-Garcia's consent to the search was obtained through exploitation of his prior illegal seizure." *Id.* at 29. Accordingly the court found suppression of the cocaine proper.

¶24 Similar to Soto-Garcia, Harrington endured a progressive intrusion at the hands of Reiber. Tate's progressive intrusion included an inquiry about Soto-Garcia's identification, warrant check, direct question about drug possession, and request to search—all of which, combined, formed a seizure. The independent elements of Harrington's seizure are different, but the effect is the same. Before Reiber's request to search, he did not ask for Harrington's name or address, did not conduct a warrant check, and did not ask if Harrington carried drugs. Instead Reiber initiated contact with Harrington on a dark street. He asked questions about Harrington's activities and travel that evening and found Harrington's answers suspicious. A second officer arrived at the scene and stood nearby. Reiber asked Harrington to remove his hands from his pockets to control Harrington's actions. Then Reiber asked to frisk, without any " 'specific and articulable facts' " that would create an objectively reasonable belief that Harrington was " 'armed and presently dangerous.' "[5] *Collins*, 121 Wn.2d at 173 (quoting *Terry*, 392 U.S. at 21, 24). The facts in both *Soto-Garcia* and this case create an atmosphere of police intrusion, culminating in a request to frisk.

¶25 Requesting to frisk is inconsistent with a mere social contact. If Reiber felt jittery about the bulges in Harrington's pockets, he should have terminated the encounter—which Reiber initiated—and walked back to his patrol car. Instead Reiber requested a frisk.

¶26 When Reiber requested a frisk, the officers' series of actions matured into a progressive intrusion substantial

---

[5] Harrington's bulgy clothing, inability to recall his sister's address, and putting his hands in his pockets do not amount to specific and articulable facts creating an objectively reasonable belief that Harrington was armed and presently dangerous.

enough to seize Harrington. A reasonable person would not have felt free to leave due to the officers' display of authority.

¶27 We note this progressive intrusion, culminating in seizure, runs afoul of the language, purpose, and protections of article I, section 7. Our constitution protects against disturbance of private affairs—a broad concept that encapsulates searches and seizures. Article I, section 7 demands a different approach than does the Fourth Amendment; we look for the forest amongst the trees.[6] As Judge Sweeney wrote, "We do a disservice to the public and to police by moving the so-called 'social contact' into just another form of seizure, albeit without any cause or suspicion of crime or danger to the public or the police." *Harrington*, 144 Wn. App. at 564 (Sweeney, J., dissenting).

¶28 Because Harrington's consent to the search was obtained through exploitation of a prior illegal seizure, suppression of the evidence is required. *See Garvin*, 166 Wn.2d at 254.

## CONCLUSION

¶29 Because an objectively reasonable person would not have felt free to leave by the time the officer asked to frisk, Harrington was unconstitutionally seized prior to arrest in violation of article I, section 7 of the Washington Constitution.

¶30 We reverse the Court of Appeals, suppress the evidence used to convict Harrington, and dismiss.

ALEXANDER, C.J., and C. JOHNSON, MADSEN, CHAMBERS, OWENS, FAIRHURST, J.M. JOHNSON, and STEPHENS, JJ., concur.

---

[6] *State v. Jackson*, 150 Wn.2d 251, 76 P.3d 217 (2003), demonstrates this approach. In *Jackson* we held warrantless installation of a GPS (global positioning system) tracking device constituted a search and seizure under article I, section 7. In our decision we looked beyond the act of installing the device and considered instead the information imparted by the device, the potential for abuse, and the surreptitious nature of the tracking.