IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 72033-3-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES D. MESSER, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: November 3, 2014 |
| | ) | |

VERELLEN, A.C.J. — James Messer appeals from his conviction for possession of methamphetamine with intent to deliver. He contends that the trial court erred in denying his motion to suppress evidence obtained during a protective frisk. In its written conclusions of law, the trial court focused upon a community caretaking exception as the basis for the stop that led to the protective frisk. But we may affirm on the alternative theory supported by the record that the police officer had a reasonable and articulable suspicion that Messer was committing a trespass together with a reasonable and articulable suspicion that Messer was armed and dangerous. The protective frisk was lawful. We affirm.

## FACTS

Deputy Matt Gray noticed a vehicle parked off of the road on private property with its lights off, blocking the gate of a radio tower at 3:00 a.m. Due to past complaints of theft at the radio tower, Deputy Gray was concerned and decided to check on the car.

He also believed the driver was criminally trespassing "because he was blocking the gate, which is the KMAS radio tower's property."[1]

Deputy Gray parked his police car nose to nose with the vehicle and used a bright spotlight to illuminate its interior. He saw two individuals, Messer and Crystal Thomas, asleep in the car. The bright light did not wake either of them. Deputy Gray approached the driver's side of the car and knocked on the window. This startled Messer, who woke up and snickered. Deputy Gray told Messer to roll down his window. In response, Messer opened the door and told Deputy Gray that his window did not roll down.

Deputy Gray observed a "big knife" in the car within Messer's reach.[2] Deputy Gray was alone. At 3:00 a.m., it was completely dark, and he was far from any occupied buildings. He pulled Messer out of the vehicle and conducted a pat-down search for officer safety. Deputy Gray found a pipe for smoking methamphetamine in Messer's front jacket pocket. He then arrested Messer for possessing drug paraphernalia, handcuffed him, and continued the weapons search. Deputy Gray found large amounts of cash, methamphetamine, plastic bags, and a digital scale on Messer.

The State charged Messer with one count of possession with intent to deliver a controlled substance. Messer moved to suppress the pipe and other evidence obtained by Deputy Gray. At the suppression hearing, the trial court heard testimony from Deputy Gray, Messer, and Thomas. The trial court denied Messer's motion to suppress the evidence. A jury found Messer guilty as charged.

Messer appeals.

---

[1] Report of Proceedings (RP) (July 19, 2012) at 10.

[2] Id. at 5.

2

## DISCUSSION

Messer contends that the trial court erred by denying his motion to suppress because the protective frisk was unlawful.[3] We disagree.

When reviewing a trial court's denial of a motion to suppress, we are presented with a mixed question of law and fact whether police have lawfully seized a person.[4] Challenged findings entered after a suppression hearing are binding if they are supported by substantial evidence, and unchallenged findings are verities on appeal.[5] The ultimate conclusion of whether those facts constitute a lawful search or seizure is reviewed de novo.[6]

The trial court mentioned a suspicion due to past thefts, but focused upon community caretaking in its conclusions of law. But we may affirm the denial of a motion to suppress "on an alternative theory, even if not relied on below, if it is established by the pleadings and supported by proof."[7]

---

[3] The Fourth Amendment of the United States Constitution prohibits unreasonable searches and seizures and, similarly, article I, section 7 of the Washington Constitution prohibits government intrusion upon private affairs without authority of law. State v. Williams, 102 Wn.2d 733, 736, 689 P.2d 1065 (1984). We analyze the issues presented in this case under the Washington Constitution because article I, section 7 grants greater protection to individual privacy rights than the Fourth Amendment. State v. Russell, 180 Wn.2d 860, 867 n.1, 330 P.3d 151 (2014).

[4] State v. Harrington, 167 Wn.2d 656, 662, 222 P.3d 92 (2009).

[5] State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003).

[6] State v. Armenta, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997).

[7] State v. Lakotiy, 151 Wn. App. 699, 707, 214 P.3d 191 (2009) (affirming denial of motion to suppress evidence obtained in a warrantless entry into a gated commercial storage facility common area on alternative theory that there was no privacy interest in the area); see also State v. Smith, 177 Wn.2d 533, 540-41, 303 P.3d 1047 (2013) (affirming "a warrantless, limited intrusion into [a] motel room was justified by the [alternative] emergency exception to the warrant requirement, . . . a subset of the community caretaking exception to the warrant requirement.").

A warrantless seizure "is valid only where there are 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' the detention of the person."[8] A seizure occurs when an individual's "freedom of movement is restrained" and a reasonable person would not believe that he is free to leave or able to decline a request due to an officer's use of physical force or display of authority.[9] Notably, our Supreme Court has held that an officer who approaches a parked car does not seize the occupants by shining a spotlight on the car, talking to the occupants, or requesting that the driver roll down his window.[10]

Here, no seizure occurred up to the point when Deputy Gray approached the car, knocked on the window, and told Messer to roll down the window. But when Messer opened the car door, revealing a big knife within his reach, Deputy Gray pulled him out of the car and patted him down for weapons. The physical contact and resulting frisk here "restrain[ed Messer's] freedom to walk away" and thus constituted a seizure.[11] Such a seizure requires constitutional justification.[12]

---

[8] O'Neill, 148 Wn.2d at 576 (quoting Terry v. Ohio, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d. 889 (1968)).

[9] Id. at 574; see United States v. Mendenhall, 446 U.S. 544, 554-55, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980) (describing circumstances that might indicate a show of authority constituting a seizure); State v. Young, 135 Wn.2d 498, 512, 957 P.2d 681 (1998).

[10] O'Neill, 148 Wn.2d at 578.

[11] Terry, 392 U.S. at 16, 19 (finding it beyond question that the officer seized Terry when he "took hold of him and patted down the outer surfaces of his clothing"); Young, 135 Wn.2d at 512.

[12] Sibron v. New York, 392 U.S. 40, 64, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968) ("Before [a police officer] places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so.").

An officer may lawfully seize an individual without a warrant and conduct a protective frisk for weapons where the initial investigatory stop is legitimate, a reasonable safety concern exists to justify a protective frisk for weapons, and the scope of the frisk is limited to the protective purpose.[13] A reasonable safety concern exists "'when an officer can point to specific and articulable facts which create an objectively reasonable belief that a suspect is armed and presently dangerous.'"[14]

The State asserts that a protective frisk can be conducted during consensual encounters if the officer believes that the citizen is armed and dangerous. In his supplemental brief, Messer seems to concede that point.[15] There is room for debate. The United States Supreme Court has not squarely addressed the constitutionality of protective frisks in the context of consensual encounters between officers and citizens.[16] There is very limited Washington authority related to protective frisks in the context of

---

[13] State v. Collins, 121 Wn.2d 168, 173, 847 P.2d 919 (1993).

[14] State v. Russell, 180 Wn.2d 860, 865, 330 P.3d 151 (2014) (internal quotation marks omitted) (quoting id.); see Terry, 392 U.S. at 30; Sibron, 392 U.S. at 64 ("In the case of the self-protective search for weapons, [the officer] must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous.").

[15] "[A] simple social contact, by itself, does not support a protective frisk. Instead, that form of investigative detention is constitutionally permissible only if the frisking officer has a founded suspicion that the subject of the frisk is armed and dangerous." Appellant's Supp. Br. at 10.

[16] See Adams v. Williams, 407 U.S. 143, 146, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972) ("So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose." (emphasis added)). But the Supreme Court has not excluded the possibility that a protective frisk may be constitutionally justified during a consensual encounter. See, e.g., Ybarra v. Illinois, 444 U.S. 85, 92-93, 100 S. Ct. 338, 62 L. Ed. 2d 238 (1979) (holding that a protective frisk of a bar patron who was present when an authorized narcotics search was taking place "was simply not supported by a reasonable belief that [the bar patron] was armed and presently

5

social contacts.[17] And there is a split of authority in other jurisdictions.[18] But we need

not decide the question here because, whether or not protective frisks are ever allowed

---

dangerous, a belief which this Court has invariably held must form the predicate to a pat down of a person for weapons").

[17] The Washington Supreme Court has noted that, if a police officer felt unsafe during a social contact that he initiated, "he should have terminated the encounter . . . and walked back to his patrol car." Harrington, 167 Wn.2d at 669. But the court was not directly confronted with the question of whether a protective frisk is authorized during consensual encounters; indeed, a protective frisk was not justified in that case because there were no "'specific and articulable facts'" that would create an objectively reasonable belief that Harrington was 'armed and presently dangerous.'" Id. (quoting Collins, 121 Wn.2d at 173).

In City of Seattle v. Hall, 60 Wn. App. 645, 806 P.2d 1246 (1991), while police officers were patrolling an area known for drug trafficking, Hall approached one of the officers and started to talk with him. Hall then became "hostile," "antsy," and "nervous" and kept his hands in his pockets. Id. at 647. Concerned for his safety, the officer frisked Hall, found a steak knife and a razor blade, and cited him for carrying a concealed weapon. Id. Even though there was no reasonable and articulable suspicion that Hall was committing or about to commit a crime, this court held that "[w]hen an individual voluntarily approaches an officer and behaves in a manner that causes the officer a legitimate concern for his or her safety, that officer is entitled to take immediate protective measures." Id. at 651.

[18] Some courts have held that reasonable suspicion of criminal conduct is a necessary prerequisite to a protective frisk. See, e.g., United States v. Burton, 228 F.3d 524, 527 (4th Cir. 2000) (stating reasonable suspicion of criminal activity necessary prerequisite to protective search); United States v. Gray, 213 F.3d 998, 1000 (8th Cir. 2000) (noting criminal activity necessary to justify pat-frisk); State v. Serna, 235 Ariz. 270, 331 P.3d 405, 410 (2014) ("[W]hen officers consensually engage citizens on the street without having any evidence of wrongdoing, the mere presence of a weapon does not afford officers constitutional permission to search weapons-carrying individuals."); Commonwealth v. Narcisse, 927 N.E.2d 439, 445 (Mass. 2010) ("[P]olice officers may not escalate a consensual encounter into a protective frisk absent a reasonable suspicion that an individual has committed, is committing, or is about to commit a criminal offense and is armed and dangerous.").

In contrast, other courts have ruled that protective frisks based entirely on suspicion that a person is armed and dangerous are permissible. See, e.g., United States v. Orman, 486 F.3d 1170, 1173 (9th Cir. 2007) ("Terry did not cabin the use of officer safety patdowns to lawful investigatory detentions."); United States v. Bonds, 829 F.2d 1072, 1075 (11th Cir. 1987) ("[A]part from any investigatory concern that crime was afoot, [officer] was entitled to frisk [citizen] to ensure his safety and the safety of the others present."); State v. Diloreto, 180 N.J. 264, 850 A.2d 1226,1236 (2004) ("[P]olice need not abandon their own safety when reasonably engaged in a caretaker activity.");

6

during consensual or community caretaking encounters, the record supports the alternative theory that the deputy had a reasonable and articulable suspicion of criminal trespass justifying the investigative stop that led to the protective frisk.

The deputy testified that he believed Messer was parked on private property owned by the radio station, blocking the gate. The trial court made an unchallenged finding of fact that Messer was parked "off the road on private property in front of the gate of the KMAS radio tower."[19] The prosecutor argued the alternative theory to the trial court that "[t]he officer did say the manner in which the car was parked was a trespass, so that gives him reason to suspect [Messer] of trespassing and gives him good cause to approach the vehicle."[20] And the trial court recognized in its oral ruling that the deputy "had a reason to go up and approach the vehicle; it was on private property."[21] Reasonable suspicion of a trespass supports an investigatory stop.[22] We conclude that even though the trial court's conclusions of law did not refer to the officer's reasonable and articulable suspicion of a trespass, that alternative theory was sufficiently developed in and considered by the trial court. We may rely upon this alternative theory as a basis to affirm the trial court ruling denying Messer's motion to suppress.

---

see also State v. Cutler, 143 Idaho 297, 141 P.3d 1166, 1173 (2006) (noting that defendant did not challenge the reasonableness of the protective frisk but nevertheless stating that "searches made pursuant to the community caretaking function in an effort to protect property or to ensure the safety of the public can be constitutionally reasonable").

[19] Clerk's Papers at 5 (Finding of Fact 2).

[20] RP (July 19, 2012) at 22.

[21] Id. at 27.

[22] See State v. Glover 116 Wn.2d 509, 514-15, 806 P.2d 760 (1991) (police conducted a lawful Terry stop, where, under the totality of the circumstances and based upon experience, location, and the conduct of Glover, police officers possessed sufficient reasonable suspicion to stop him to investigate him for criminal trespass).

Because the deputy was conducting a legitimate investigatory stop, he could engage in a protective frisk for weapons if particular facts allowed him to reasonably infer that the individual was armed *and* dangerous.[23] Knowledge that a defendant has a weapon within his reach "'when combined with other circumstances that contribute to a reasonable safety concern, . . . could lead a reasonably careful officer to believe that a protective frisk should be conducted to protect his or her own safety and the safety of others.'"[24] "'[C]ourts are reluctant to substitute their judgment for that of police officers in the field. A founded suspicion is all that is necessary, some basis from which the court can determine that the detention was not arbitrary or harassing.'"[25]

Officer Gray has 12 years of law enforcement experience. "He may, of course, rely on this experience in deciding how to act."[26] Despite Deputy Gray's request that Messer roll down his window, Messer opened the car door, revealing a big knife within his reach. Deputy Gray testified it was 3 in the morning, completely dark, far from any occupied building, and he was alone. Such circumstances could lead a reasonably careful officer to believe that a protective frisk should be conducted to protect his or her own safety and the safety of others.[27] The record supports the protective frisk.

---

[23] Terry, 392 U.S. at 27.

[24] Russell, 180 Wn.2d at 867 (alteration in original) (quoting Collins, 121 Wn.2d at 177).

[25] Id. at 867-68 (internal quotation marks omitted) (quoting State v. Belieu, 112 Wn.2d 587, 601-02, 773 P.2d 46 (1989).

[26] State v. Setterstrom, 163 Wn.2d 621, 627, 183 P.3d 1075 (2008).

[27] Collins, 121 Wn.2d at 174-75 (protective frisk justified "because the stop occurred in the early morning when it was still dark" and darkness made it difficult for officer to see and "an individual stopped may be more willing to commit violence against a police officer at a time when few people are likely to be present to witness it.").

Messer contests the trial court's finding that, when Messer opened his car door, Deputy Gray observed a big knife near Messer. Messer also contests the trial court's finding that Deputy Gray then pulled Messer out of the car, patted him down for officer safety starting from top to bottom, and during the pat down, felt an unusually large pipe in Messer's shirt pocket by plain feel, without moving or manipulating the pipe.

But each of these disputed findings is supported by substantial evidence. At the suppression hearing, Deputy Gray testified that when Messer opened the car door, he saw a Jim Bowie type of knife on the left side of Messer's leg in what he thought was the door panel. Deputy Gray testified that the knife was within Messer's reach, so he wanted Messer out of the car to distance Messer from the knife. He further testified that after Messer was out of the car, he patted Messer down for weapons and felt a large glass pipe in the front pocket of Messer's coat. Deputy Gray testified that he started the frisk at the top front of Messer's person and worked his way down. Without moving the pipe or manipulating it in any way, Deputy Gray testified that he recognized the pipe in Messer's pocket as a meth pipe.

Messer argues that Deputy Gray's testimony cannot constitute substantial evidence because it conflicts with the testimony given by both himself and Thomas. But credibility determinations are left to the trial court.[28] Contrary to Messer's arguments, the trial court was not required to make an explicit finding that it found Deputy Gray more credible than Messer or Thomas. Nor was the State required to introduce the knife as evidence at the suppression hearing in order for the trial court to find Deputy

---

[28] State v. Tyler, 177 Wn.2d 690, 715, 302 P.3d 165 (2013).

Gray credible. Messer's arguments to the contrary are not supported by legal authority and, therefore, are not persuasive.[29]

Messer also argues that Deputy Gray's initial contact with him did not satisfy the requirements for a Terry stop based upon a suspicion of possible theft. He relies on Adams v. Williams,[30] a United States Supreme Court case where an officer relied upon an informant's reliable tip that the defendant had committed a crime and had a gun hidden in his waistband. Specifically, he argues that unlike Adams, Deputy Gray had no basis for a Terry stop based upon his hunch that Messer might be involved in a theft. Here, even if approaching Messer's car constituted a seizure, the Terry stop was lawful based upon Deputy Gray's reasonable and articulable suspicion of criminal trespass.

Because the deputy conducted a valid investigatory stop on the reasonable and articulable suspicion of criminal trespass and the record also supports a reasonable and articulable suspicion that Messer was armed and dangerous, the protective frisk was warranted. This alternative basis supports the trial court's denial of Messer's motion to suppress. Accordingly, we affirm.

WE CONCUR:

_____

_____

_____
COX, J.

_____

[29] See RAP 10.3(a)(6) (parties are required to support their arguments with citations to legal authority); State v. Lord, 117 Wn.2d 829, 853, 822 P.2d 177 (1991) (arguments not supported by pertinent authority need not be considered).

[30] 407 U.S. 143, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972).