IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 35351-6-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| DANIEL HERBERT DUNBAR, | ) | |
| | ) | |
| Appellant. | ) | |

PENNELL, J. — Daniel Herbert Dunbar appeals his conviction for unlawful possession of methamphetamine. We affirm.

FACTS

On a September morning in 2016, two Spokane County sheriff's deputies were dispatched to 4130 South Sundown Drive in response to an anonymous report of

suspicious activity. The report indicated there had been a lot of nighttime traffic at the address and that a house on the property was believed to be a "meth[1] lab." 1 Report of Proceedings (RP) (Mar. 30, 2017) at 8.

Sundown Drive is a paved county road, located in a residential area. The property at 4130 South Sundown Drive bisects Sundown Drive and hosts three separate houses. Although Sundown Drive does not run through 4130 South Sundown Drive, a private driveway connects the two ends of Sundown Drive and provides access for the three houses. A cattle gate blocks the driveway on the east, where it meets Sundown Drive. There is no gate on the west.

The first law enforcement officer at the scene arrived at the gated entry on the east end of the driveway. This initial officer did not enter the property; rather, he remained outside the gate. Shortly after the officer arrived, a Chevrolet Suburban began to back out of the driveway away from the easternmost house on the property. Daniel Dunbar was driving the vehicle. His girlfriend was also in the car. The officer stopped the Suburban by "waving his arms" and "saying, hey, hey." *Id*. at 28. Mr. Dunbar's girlfriend rolled down her window and began speaking with the officer from a distance of 15 feet.

---

[1] Methamphetamine.

2

Deputy Griffin Criswell arrived shortly after the first officer. He approached the area from the west side of the driveway, which was not blocked by a gate. From the area where Deputy Criswell parked his vehicle, he was unable to see inside the Suburban.

Deputy Criswell was familiar with Mr. Dunbar, and knew that Mr. Dunbar had frequent interactions with the criminal justice system. Upon walking up to the Suburban and contacting its occupants, Deputy Criswell recognized Mr. Dunbar and asked him if he had any outstanding warrants. Mr. Dunbar responded that he was not aware of any. Deputy Criswell then called Mr. Dunbar's name into radio dispatch and confirmed several misdemeanor warrants for Mr. Dunbar's arrest. [2] Mr. Dunbar was then arrested and searched.

During the search incident to arrest, Deputy Criswell found a small plastic grocery bag in Mr. Dunbar's pocket. The bag was knotted shut. Inside the bag, Officer Criswell discovered a milky, crystalline substance that field-tested positive for methamphetamine. The state crime lab later confirmed the substance was methamphetamine.

Mr. Dunbar was charged by information with possession of a controlled substance. Prior to trial, he moved to suppress evidence seized at the time of his arrest. He argued

---

[2] Deputy Criswell explained he ran Mr. Dunbar's name for warrants, "[b]ecause I've had numerous run-ins with him and he's rather prolific." 1 RP (Mar. 30, 2017) at 11.

law enforcement violated his right to privacy by arresting him on a private driveway.

According to Mr. Dunbar, the driveway at 4130 South Sundown Drive was marked with

three separate no trespassing signs, one for each of the houses serviced by the driveway.

Deputy Criswell denied seeing any such signs.

Based on the evidence presented at the hearing, the trial judge denied Mr.

Dunbar's suppression motion. The court recognized that the driveway was privately

owned and not a part of Sundown Drive. However, it determined that Deputy Criswell's

use of the driveway was not unreasonable, given that the driveway serviced three homes.

Although the parties had not raised the issue of whether Mr. Dunbar had been

unconstitutionally seized prior to his formal arrest, the trial judge found that "[t]here was

no evidence presented that law enforcement seized Mr. Dunbar prior to his being arrested

for the active warrants." Clerk's Papers (CP) at 39.

A different judge presided over Mr. Dunbar's trial. Just prior to trial, the court

held a hearing regarding the admissibility of Mr. Dunbar's post-arrest statements to

Deputy Criswell. At this hearing, Deputy Criswell admitted seeing the no trespassing

signs. However, Deputy Criswell explained he did not believe the no trespassing signs

pertained to the driveway. He testified that there was no gate blocking his access to the

driveway. The trial court determined that Mr. Dubar's post-arrest statement was subject

4

to suppression. However, the court did not disturb the prior trial judge's decision as to

whether there had been an unlawful search.

At trial, the State offered isolated testimony from the dispatch report, indicating

that officers were responding to a potential "meth lab." The testimony was as follows:

> Q: And did the radio provide you with details of that suspicious
> vehicle?
> A: They did. If I could consult the CAD, which is our computer-aided
> dispatch program. It said a white travel trailer showed up sometime last
> night and provided a Washington plate, and says trailer is on the yard at
> location. *House is likely a meth lab*, lots of traffic at night and car doors
> slamming at night keeping neighbors up at night.

1 RP (May 2, 2017) at 195 (emphasis added). No additional testimony was elicited

regarding the "meth lab" allegation. The allegation was not repeated at any point during

trial or summation.

Mr. Dunbar's defense consisted of challenging the State's ability to prove that the

substance in his possession was methamphetamine. Counsel elicited the fact that the bag

containing the methamphetamine was found to be "leaking" at the time it arrived at the

state crime lab. 2 RP (May 2, 2017) at 257-58; 2 RP (May 3, 2017) at 265-66. The jury

heard testimony on how the evidence was stored, including the use of Ziploc bags at the

property, and additional Ziploc bags and an evidence envelope once the evidence was

5

sent for storage. The jury also heard testimony on the crime lab's anticontamination

measures and the transportation measures used to guard against evidence contamination.

Mr. Dunbar was convicted of possession of a controlled substance. He was

sentenced to 12 months and 1 day of confinement. Mr. Dunbar now timely appeals from

that judgment and sentence.

## ANALYSIS

*The trial court's suppression rulings*

Review of a trial court's suppression rulings involves mixed questions of fact

and law. *State v. Samalia*, 186 Wn.2d 262, 269, 375 P.3d 1082 (2016). A trial court's

factual findings are reviewed for substantial evidence. *State v. Hill*, 123 Wn.2d 641,

647, 870 P.2d 313 (1994). Legal conclusions are reviewed de novo. *State v. Russell*,

180 Wn.2d 860, 867, 330 P.3d 151 (2014).

*Private driveway*

Mr. Dunbar argues Deputy Criswell violated his right to privacy[3] by entering the

private driveway at 4130 South Sundown Drive without a warrant. According to Mr.

Dunbar, Deputy Criswell's conduct amounted to an illegal search and evidence obtained

from the search, including the methamphetamine, should have been suppressed.

---

[3] U.S. CONST. amend. IV; WASH. CONST. art. I, § 7.

We find no illegal entry or search. Law enforcement, like members of the public, have implied permission to attempt contact with a home's occupants during daylight hours by utilizing a home's driveway. *State v. Ross*, 141 Wn.2d 304, 312-13, 4 P.3d 130 (2000). A no trespassing sign, alone, is insufficient to manifest an intent to revoke this implied permission. *State v. Jesson*, 142 Wn. App. 852, 858-59, 177 P.3d 139 (2008). Instead, additional indicators of privacy such as a high fence, closed gate, security device, dogs, or remote location are necessary to relay a property holder's intent to close a home's access route to the public. *Id.; see also State v. Chaussee*, 72 Wn. App. 704, 710, 866 P.2d 643 (1994).

The facts in this case do not suggest that the implied invitation to access the houses on South Sundown Drive had been revoked or that Deputy Criswell ventured into an area that was not impliedly open to the public. The three houses on South Sundown Drive shared a single driveway. It was therefore foreseeable that a variety of unknown visitors and business persons would access the area. Deputy Criswell did not deviate from what would reasonably be expected of a business invitee or some other visitor. He did not deploy subterfuge to enter the property. He was at the property during daylight hours and did not breach any closed gates or fences. Given the totality of these circumstances, the trial court correctly determined Deputy Criswell did not engage in an illegal warrantless

7

search when he made contact with Mr. Dunbar in the driveway to 4130 South Sundown

Drive.

### Seizure of Mr. Dunbar

Mr. Dunbar also argues that he was illegally seized without a warrant when law

enforcement officers stopped his vehicle, asked him about outstanding warrants, and ran

his name for warrants.[4]  Mr. Dunbar has the burden of demonstrating illegal seizure.

*State v. O'Niell*, 148 Wn.2d 564, 574, 62 P.3d 489 (2003).  He has not met this

requirement.

A law enforcement officer may engage members of the public in social

interactions without implicating constitutional rights to be free from governmental

intrusion.  *State v. Harrington*, 167 Wn.2d 656, 664-65, 222 P.3d 92 (2009); *State v.

Young*, 135 Wn.2d 498, 511, 957 P.2d 681 (1998).  Whether a particular interaction with

law enforcement amounts to a seizure or a social contact requires objectively assessing

the totality of the surrounding circumstances.  An encounter will rise to the level of a

seizure only when the officer's use of force or show of authority would lead a reasonable

---

[4] Mr. Dunbar also argues that the warrant check violated his right to privacy.  This complaint is unfounded as warrant information is contained within a public database, not private property.

person to feel compelled to remain on the scene or to comply with law enforcement's commands. *O'Neill*, 148 Wn.2d at 574; *Young*, 135 Wn.2d at 511.

Prior to his arrest on outstanding warrants, Mr. Dunbar's contact with the law enforcement officers was very limited. His vehicle had been flagged down by the initial officer at the scene. However, law enforcement did not signal that Mr. Dunbar was required to stop his car by using a siren or overhead lights. *Harrington*, 167 Wn.2d at 665 (absence of siren or overhead lights indicative of social contact). In fact, the two patrol cars on the scene were located a considerable distance from Mr. Dunbar's vehicle. *Id.* (inference of social contact when patrol car was out of sight). In addition, the evidence at the suppression hearings did not show that, prior to the arrest, law enforcement officers ever directed Mr. Dunbar's movements or sought to control the scene. *See id*. at 666-67 (request to remove hands from pocket suggestive of seizure). Nor did officers engage in threatening conduct, such as physically touching Mr. Dunbar, displaying their weapons, requesting a frisk, or using strong language. *Id*. at 666-68 (explaining circumstances that convert a social contact into a seizure).

The only pre-arrest circumstances that could have been indicative of a seizure, as opposed to a social contact, were the presence of two officers and Deputy Criswell's question regarding warrants. These were not sufficiently intrusive to convert Mr.

Dunbar's exchange with Deputy Criswell into a nonconsensual seizure. The record

does not suggest that the presence of two officers, as opposed to one, made the scene

"threatening." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L.

Ed. 2d 497 (1980). Given the apparent history between Deputy Criswell and Mr. Dunbar,

a reasonable person in Mr. Dunbar's position would have expected to have his name run

for warrants. Accordingly, Deputy Criswell did not change the nature of his interaction

with Mr. Dunbar merely by referencing this obvious issue. The trial court's conclusion

that Mr. Dunbar's pre-arrest contact with Deputy Criswell did not amount to seizure was

warranted.

*Admission of contents of 911 call at trial*

At trial, Mr. Dunbar moved to exclude testimony regarding the details of the

anonymous 911 call. Specifically, Mr. Dunbar objected to the caller's claim regarding a

suspected "meth lab." Mr. Dunbar argued that this allegation was irrelevant and its

admission would deny Mr. Dunbar his right of cross-examination.[5] U.S. CONST. amend.

VI; WASH. CONST. art. I, § 22. The trial court allowed the State to elicit evidence of the

---

[5] Mr. Dunbar also challenges the admission of the anonymous allegation on grounds of improper character evidence under ER 404. However, the record does not show that he raised this specific objection in the trial court. Accordingly, an objection based on character evidence grounds has been waived on appeal, and this court will not address it on the merits. RAP 2.5(a).

allegation under the theory that it was relevant to the state of mind of the law enforcement officers.

We agree with Mr. Dunbar: the evidence in question should have been excluded. The anonymous caller's allegation that the property housed a "meth lab" had little technical relevance to the State's case. Law enforcement could have easily explained their reasons for going out to South Sundown Drive without mentioning that specific issue. But at the same time, the anonymous caller's allegation was at least somewhat suggestive of guilt[6] and, as such, raised concerns regarding Mr. Dunbar's constitutional right to confront adverse witnesses. *See State v. Lui*, 179 Wn.2d 457, 480, 315 P.3d 493 (2014) (confrontation clause applies to witnesses against the defendant). The information relayed by the caller was testimonial, in that it relayed evidence of a past crime to law enforcement. *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). Because cross-examination of the anonymous caller was never afforded or even possible, the caller's inculpatory statements should have been excluded.

---

[6] Given that Mr. Dunbar's defense was that the State failed to prove the substance in his pocket was methamphetamine, the anonymous caller's allegation that Mr. Dunbar was driving away from a suspected "meth lab" could have suggested to the jury that the substance in Mr. Dunbar's pocket was, in fact, methamphetamine. Evidence need not be conclusive, nor even strong, to be inculpatory.

11

While the trial court should have excluded the anonymous caller's "meth lab" allegation, we find this error harmless beyond a reasonable doubt. *See State v. Jasper*, 174 Wn.2d 96, 117, 271 P.3d 876 (2012) (confrontation clause violations are subject to a harmless error analysis). The reference to the anonymous caller's allegation was brief, it was not repeated, and it did not pertain to Mr. Dunbar's defense regarding mishandled evidence. In addition, the untainted evidence at trial was overwhelming. Accordingly, "where the untainted evidence admitted is so overwhelming as to necessarily lead to a finding of guilt, [a confrontation clause violation] is harmless." *State v. Davis*, 154 Wn.2d 291, 305, 111 P.3d 844 (2005), *aff'd by Davis v. Washington*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). Having reviewed the record, we find no reasonable possibility that the outcome of Mr. Dunbar's trial would have been different had the trial court excluded the 911 caller's allegation. The conviction is therefore affirmed.

## REQUEST TO STRIKE TRIAL COURT COSTS

Citing *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018), Mr. Dunbar has filed supplemental briefing requesting that we strike the $200 criminal filing fee and $100 deoxyribonucleic acid (DNA) collection fee imposed by the trial court at sentencing. *Ramirez* was decided after the close of briefing in this case. The decision held that the

2018 amendments[7] to Washington's legal financial obligation scheme apply prospectively to cases on direct appellate review at the time of enactment. Of interest to Mr. Dunbar, the 2018 amendments prohibit imposition of a $200 criminal filing fee on defendants who are indigent at the time of sentencing as defined by RCW 10.101.010(3)(a)-(c). RCW 36.18.020(2)(h). Also prohibited is the assessment of a DNA database fee if the state has previously collected the defendant's DNA as a result of a prior conviction. RCW 43.43.7541.

The record before the court indicates Mr. Dunbar's request for relief is controlled by *Ramirez*.[8] Specifically, Mr. Dunbar was indigent at the time of sentencing as defined by RCW 10.101.010(3)(a) (receiving public assistance) and RCW 10.101.010(3)(c) (receiving income of 125 percent or less of the current federally established poverty level) and Mr. Dunbar's lengthy felony record is an indication that a DNA fee has been previously collected. Accordingly, we grant Mr. Dunbar his requested relief on this issue and direct the trial court to strike the $200 criminal filing fee and the $100 DNA fee from Mr. Dunbar's judgment and sentence.

---

[7] LAWS OF 2018, ch. 269.

[8] The State has not responded to Mr. Dunbar's supplemental assignment of error.

## CONCLUSION

Mr. Dunbar's conviction is affirmed. This matter is remanded to the trial court with instructions to strike the $200 criminal filing fee and the $100 DNA collection fee from Mr. Dunbar's judgment and sentence.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Pennell, J.

WE CONCUR:

_____    _____
Lawrence-Berrey, C.J.            Siddoway, J.

14