IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, <br><br> Appellant, <br><br> v. <br><br> JOHN FREDERICK BUDIG II, <br><br> Respondent. | No. 80078-7-I <br><br> DIVISION ONE <br><br> UNPUBLISHED OPINION |

CHUN, J. — The State charged John Budig with one count of possession of heroin. Budig moved to suppress the evidence found during a search incident to his arrest, claiming that a deputy's Terry[1] frisk for weapons was unlawful, and moved to dismiss the case. The trial court granted Budig's motions. On appeal, the State argues that the trial court erred by applying the wrong legal standard to suppress the evidence. We agree, reverse, and remand for trial.

## I. BACKGROUND

One spring evening, around 10:30 p.m., a woman called 911 from an "extremely rural" area of Snohomish County and reported "an individual shining some form of blue laser at passing cars." Snohomish County Sheriff's Deputy Christopher Leyda responded.

Deputy Leyda drove to the scene in a fully marked and equipped Snohomish County Sheriff's Office patrol truck. Once there, he found a car

_____

[1] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

Citations and pin cites are based on the Westlaw online version of the cited material.

parked in the middle of the roadway with its lights flashing. The reporting party was inside the vehicle. It was "dark out that night," the area had no overhead street lights, and the only source of lighting came from Deputy Leyda's lights and the headlights from the reporting party's car.

The reporting party told the deputy that an unknown male had flashed a laser in her eyes while she was driving. She then pointed to a male standing in a driveway about a half-mile north of their location and said "that's him." She also reported noticing a silver Volkswagen "drive out from that same driveway," stop next to the male, and then come and go several times. She felt this behavior was odd and decided to call 911.

During the investigation, while Deputy Leyda was gathering information from the reporting party, the male walked over to them with no prompting and approached the deputy. The male initiated a conversation and identified himself as John Budig. Deputy Leyda did not "know who [Budig] was until" responding to this call.

According to Deputy Leyda, Budig "said his car had broken down and he was waiting for a tow truck." And Budig, presumably based on the deputy's investigative questions, "admitted that he did have a laser but he wasn't shining it at anybody." While he described Budig as being helpful, affable, and cordial during the encounter, the deputy grew concerned by Budig's demeanor. He observed that Budig was wearing two jackets, with one of them being "like a North Face jacket." To the deputy, Budig appeared "very nervous," fidgety, wide-eyed, "looking around and not at me," and sweaty "even though it was cold out."

2

He was most alarmed by Budig continuing to put his hands in his pockets despite being directed not to do so. Based on these observations, "and the suspicious nature of the call," Deputy Leyda decided to pat down Budig for weapons. The deputy later described his reasons for frisking Budig:

> The fact that I was by myself,[2] it was dark out, it was extremely poorly lit, his demeanor, the fact that he was wearing multiple layers of clothing, and again, the biggest one was the fact that he kept putting his hands in his pockets.

Deputy Leyda informed Budig he would perform a pat down and told Budig to turn around. When the deputy asked if Budig "had any weapons" on him, Budig said "no" and told the deputy "I haven't done anything wrong." Despite his initial objection, Budig quickly complied when the deputy "told him that he was being detained" or "told him he was not free to leave." The deputy found a switchblade knife in Budig's pocket. Deputy Leyda then arrested Budig for possessing a dangerous weapon in violation of RCW 9.41.250(1)(a).

During a search incident to arrest, Deputy Leyda found both heroin and methamphetamine in Budig's pockets. The State later charged Budig with one count of possessing a controlled substance (heroin).

Budig moved under CrR 3.6 to suppress all evidence stemming from the deputy's frisk. He argued that the Terry pat down for weapons was unlawful because the deputy lacked reasonable suspicion that he was armed and presently dangerous. After a hearing, the trial court concluded that "Deputy Leyda had an actual, legitimate concern that Mr. Budig was armed based on his

---

[2] It is unknown if the reporting party left the area during Budig's contact with Deputy Leyda.

behavior, the time of night, and the conditions of the area of contact." Then, however, the trial court concluded that Deputy Leyda's encounter with Budig was a social contact that progressed into an unlawful seizure under article I, section 7 of the Washington Constitution and granted the motion to suppress. Because the trial court's ruling on the motion to suppress effectively terminated the State's case, it dismissed the charge against Budig with prejudice.

The State appeals.

## II. ANALYSIS

The State contends that the trial court failed to apply the correct test to determine the validity of a Terry weapons frisk. We agree.

We review conclusions of law from a suppression hearing de novo. State v. Winterstein, 167 Wn.2d 620, 628, 220 P.3d 1226 (2009).

In a Terry stop, a law enforcement officer "may briefly stop and detain an individual for investigation without a warrant," and under proper circumstances, "briefly frisk the individual for weapons." State v. Garvin, 166 Wn.2d 242, 250, 207 P.3d 1266 (2009). For such a frisk to be lawful, the State must show that "(1) the initial stop is legitimate, (2) a reasonable safety concern exists to justify the protective frisk for weapons, and (3) the scope of the frisk is limited to the protective purposes." Garvin, 166 Wn.2d at 250 (citing State v. Duncan, 146 Wn.2d 166, 172, 43 P.3d 513 (2002)).

Here, Deputy Budig responded to a 911 call to investigate a traffic hazard about a male shining a laser in the eyes of passing drivers.[3]  Initially, the deputy did not know the subject of this investigation, "but [it] later turned out to be" Budig.  Upon arriving at the scene, the reporting party pointed to Budig and said "that's him."  Budig then walked over to the deputy and identified himself.  Then, in response to the deputy's presumed questioning, Budig "admitted that he did have a laser but he wasn't shining it at anybody."  The deputy also directed Budig keep his hands free during this time, but Budig "wouldn't keep his hands out of his pockets."  Determining the exact point at which this encounter became a Terry stop is not critical to our analysis.  Considering the totality of the circumstances, it is clear to us that by the time Deputy Leyda frisked Budig this was a Terry encounter.

The fact that Budig approached the deputy does not place the encounter beyond the reach of a Terry analysis.  As a practical matter, even absent Budig initiating contact, the fact remains that Budig was the subject of this investigation and Deputy Leyda would have "stopped" him to inquire about the laser activity.  Budig cannot avoid a stop simply by approaching the deputy.  Moreover, Deputy Leyda had adequate grounds to frisk Budig to the extent the deputy had legitimate concerns about his safety.  See City of Seattle v. Hall, 60 Wn. App. 645, 651, 806 P.2d 1246 (1991) ("When an individual voluntarily approaches an officer and behaves in a manner that causes the officer a

---

[3] Shining a laser into a moving vehicle may violate RCW 9A.84.030(1)(c) (disorderly conduct) and RCW 9A.49.030(1)(a) (second degree unlawful discharge of a laser).

legitimate concern for his or her safety, that officer is entitled to take immediate protective measures.").

Here, Budig's motion to suppress neither challenged the legitimacy of any initial Terry stop, likely because he freely approached the deputy, nor contested the scope of the deputy's frisk. Budig argued only that "there are not specific and articulable facts to support a reasonable belief that [he] was armed and presently dangerous." And the trial court resolved this issue when it concluded the deputy "had an actual, legitimate concern" that "Budig was armed based on his behavior, the time of night, and the conditions of the area of contact."

But the trial court went beyond what was needed to decide Budig's motion. The trial court raised a "social contact"[4] issue that the parties did not present and concluded that the deputy unlawfully seized Budig akin to the situations in State v. Harrington[5] and State v. Johnson,[6] an argument that neither party advanced. Moreover, both Harrington and Johnson are distinguishable because they concern initial social contacts that escalated into unlawful seizures in violation of article I, section 7.

In Harrington, the court concluded that an officer's actions amounted to a progressive intrusion that seized the defendant. 167 Wn.2d at 669-70. There, a police officer made a U-turn, got out of his patrol car, and approached Harrington

---

[4] A "social contact" merely describes an encounter between law enforcement and an individual that does not amount to a seizure. Johnson, 8 Wn. App. 2d 728, 735, 440 P.3d 1032 (2019). The term rests "someplace between an officer's saying 'hello' to a stranger on the street and, at the other end of the spectrum, an investigative detention (i.e., Terry stop)." Harrington, 167 Wn.2d at 664.

[5] 167 Wn.2d 656, 222 P.3d 92 (2009).

[6] 8 Wn. App. 2d 728, 440 P.3d 1032 (2019).

around 11:00 p.m. while he was walking along a sidewalk. The officer questioned Harrington about his activities and travel. A second officer arrived on scene in a patrol car and stood near to Harrington. The first officer requested that Harrington remove his hands from his pockets, and then asked for consent to frisk. The court noted, "[r]equesting to frisk is inconsistent with a mere social contact." Harrington, 167 Wn.2d at 669. The court held that when the officer requested to frisk Harrington, "the officers' series of actions matured into a progressive intrusion substantial enough to seize Harrington. A reasonable person would not have felt free to leave due to the officers' display of authority." Harrington, 167 Wn.2d at 669-70. The court then suppressed the evidence used to convict Harrington and dismissed the case. Harrington, 167 Wn.2d at 670.

In Johnson, two police officers were engaged in a routine patrol late at night in an area known to have a high rate of criminal activity and became suspicious that the occupants of a parked vehicle were using drugs. 8 Wn. App. 2d at 733. The "two uniformed officers" approached Johnson's vehicle, shined flashlights in it, and repeatedly questioned the driver, "is this Taylor's vehicle," in a "ruse" intended to make Johnson "feel more comfortable, in the hope that he would talk with the officer." Johnson, 8 Wn. App. 2d at 733-34, 742. The officers then engaged Johnson in conversation and eventually asked for proof of Johnson's identity. While one officer was attempting to verify Johnson's identity with dispatch, the second officer noticed a firearm in Johnson's vehicle and detained him. Johnson, 8 Wn. App. 2d at 734. We held Johnson was seized at the point when officers requested proof of his identity because "a

7

reasonable innocent person in Johnson's position would not have felt free to leave the scene, to disregard the officer's requests, to ignore the officers, or to otherwise terminate the encounter."  Johnson, 8 Wn. App. 2d at 745.

Beyond not involving a Terry situation, and unlike Budig's situation, neither defendant in Harrington or Johnson were the "subject of investigation" of a 911 call to which officers responded.

Accordingly, we reverse the trial court's order granting Budig's motion to suppress and remand for trial.[7]

_Chun, J._

WE CONCUR:

_Mann, C.J._

_Verellen, J._

---

[7] Given our disposition, we need not reach the State's remaining challenges to the trial court's findings of fact and conclusions of law.