# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | NO. 72369-3-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| COLLEEN MUIR, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: April 13, 2015 |
| | ) | |

2015 APR 13 AM 9: 19
COURT OF APPEALS DIV 1
STATE OF WASHINGTON
FILED

LAU, J. — Colleen Muir was convicted of possession of methamphetamine with intent to deliver. On appeal, she argues (1) the trial court erred by failing to enter written findings after a suppression hearing as required by CrR 3.6, and (2) the trial court should have suppressed the methamphetamine because her consent to the search of her safe was invalid since it was the product of an unlawful seizure. Because the trial court's oral ruling is sufficiently comprehensive to allow a meaningful review of the issues and Muir was not seized before granting consent, we affirm the judgment and sentence.

## FACTS

Testimony at the CrR 3.6 suppression hearing shows the following: On February 7, 2013, Colleen Muir was a passenger in a truck driven by James McIntyre in Bremerton, Washington. Muir and McIntyre parked and entered a small convenience store. Police arrived and entered the store where they arrested McIntyre on an outstanding warrant. In a search incident to arrest, they discovered hypodermic needles commonly used for intravenous drug use.

Detective Aaron Elton learned that officers found the needles while searching McIntyre. Detective Elton stood outside, looked into the truck, and saw McIntyre's backpack in the truck bed.

Muir remained in the store after McIntyre's arrest. Detective Elton testified that Muir was "just standing there. It's a pretty small store. So [Muir] [is] standing there. I contacted her." RP (May 28, 2013) at 10. Detective Elton knew she was the passenger in the truck so he asked for her name and she told him. He did not ask her for identification or driver's license.

Detective Elton testified that the both of them walked out of the store together. He did not tell her to come outside with him. He testified that he did not request or issue any commands, direct her to stay, or physically touch her. Detective Elton testified that shortly after Muir left the store she sat down on the curb. He recontacted her to clarify which of the items he saw inside the truck belonged to her so he "could gain consent from both parties to search the truck." RP at 12.

Detective Elton asked Muir for consent to search the truck. Muir said it was up to McIntyre. Detective Elton left and spoke to McIntyre, leaving Muir unattended.

-2-

McIntyre consented to the search but said it was up to Muir because the truck belonged to her boyfriend. Detective Elton reported back to Muir and told her McIntyre had consented but that it was her decision. Muir consented to a search of the truck.

Detective Elton said that from outside the truck he could see a small, oblong, flat safe with a locking mechanism. He could also see handbags and a cell phone on the driver's seat. Detective Elton asked Muir if she owned any of the items. Muir said she purchased the safe that morning for $20. She denied ownership of the other items.

Detective Elton described the tone of the contact with Muir at this point as "conversational." RP at 14. He described Muir's demeanor as normal and her responses to his questions as appropriate.

Detective Elton and another officer searched the truck. Detective Elton discovered a methamphetamine pipe in a bag that neither McIntyre nor Muir claimed to own. He asked Muir for permission to open the safe. She denied knowledge of the combination, but she said that if he was able to, he could open it. Detective Elton said he noticed that the combination was set to the numbers 1-9-7-6, which he considered peculiar. He moved the combination one number to 1-9-7-5 and the safe opened. He found a scale and methamphetamine inside.

Detective Elton arrested Muir and advised her of her Miranda[1] rights. She responded that she understood. He then asked her for permission to search her purse, and she agreed. Muir said that McIntyre handed her methamphetamine in the store.

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Detective Elton looked in the purse and discovered methamphetamine wrapped in a $20 bill.

On cross-examination, Detective Elton testified that he may have told Muir he wanted to talk with her outside of the convenience store. He testified that there were two marked and two unmarked police vehicles present but that none blocked the truck.

Muir testified that Detective Elton first encountered her in the store and asked to speak with her outside. Once outside, Muir stated that Detective Elton said, "Well, why don't you have a seat." RP (May 28, 2013) at 31. Muir said it was about 15 minutes from the time she sat down to the time Detective Elton opened the safe. She testified that Detective Elton asked her if she planned on buying drugs anywhere and where she would go to purchase them. He also asked her where she would go to buy heroin if she wanted to purchase it.

Muir also testified that Detective Elton asked her three times for consent to search the truck and that she declined his requests. She stated that when he left to speak with McIntyre, he was out of her view and she did not know where he went.

According to Muir, when Detective Elton asked if he could search the safe she said that she did not have the combination. She testified that she did not feel free to leave during the encounter because her purse was on the ground and officers were in the area.

Trial Court's Oral Findings of Fact and Conclusions of Law

After the CrR 3.6 hearing, the trial court denied Muir's suppression motion and determined that no unlawful seizure occurred, the consent to search was voluntary, and Detective Elton testified credibly.

-4-

Ms. Muir testified that while she was in the store, she was approached by Officer Elton, who said that he would like for me to come outside so he can talk to me. He didn't—the testimony is not that he ordered her to come outside or otherwise indicated to her to come outside or touched her elbow and guided outside. The evidence is he would like for me to come outside so he can talk to me. Got her outside. Asked her her name. Ms. Muir's testimony is he asked her why don't you have a seat. That's not an order to sit on the curb. It's not a directive. It's more like an invitation. I'm certain that Officer Elton wanted her to sit on the curb and probably didn't want her to leave. But the—it was phrased as a request. Only about ten or 15 minutes elapsed between the time that Officer Elton asked her to go outside and the time that he seized the safe.

Officer Elton did not rebut Ms. Muir's testimony that he was asking her information about the drug trade. He probably did. That doesn't make the situation custodial. Officer Elton might have been on a fishing expedition. But there's nothing wrong with a fishing expedition, as long as you get consent. A fishing expedition without consent is illegal.

He did ask for consent three times, but it wasn't a badgering attempt. He asked for consent the first time, and Ms. Muir said: You'll have to ask Mr. McIntyre, because it's not my truck. So Officer Elton testified that he wants consent from everybody in that truck, which is, I think, a prudent thing to do. So he goes and asks Mr. McIntyre. Mr. McIntyre says yes. So he comes back and asks the second time, and she says yes.

Importantly, when he went—when Officer Elton asked—after Officer Elton asked for consent from Ms. Muir the first time, he, according to Ms. Muir, left to go talk to Mr. McIntyre and was out of her view, during that period of time. Certainly, it's not a true custodial interrogation or custodial matter when the officer walks off and he's outside your view. I would think of no clearer invitation to walk off.

So I find that Ms. Muir was not seized, nor was she in custody at the time that she was asked for consent. I don't think that her consent was the product of coercion or duress.

The one area of disagreement is that Officer Elton says that when he asked for her permission to search—to open the safe, his testimony was, I don't know the combination but yes. Her testimony is, I don't have the combination to it, period. Of those two responses, I think it is more likely—well, I think that Officer Elton's version of the conversation rings more true. If you're going to remark that you don't have the combination, the—I think the more rational, conversational way to phrase it was "yes but", as opposed to, I don't have a combination, which is more or less nonresponsive. I find that the greater weight of the evidence is that Officer Elton received a response of, Yes, but I don't have combination to it, and I'll rule that it was consent. Thereafter, Ms. Muir testified that the mood changed. And I have no doubt that it did. But importantly, she also testified that she would have felt free to leave without the truck.

I find, by the greater weight of the evidence, that the consent was not a result—well, that she was—I find by the greater weight of the evidence that Ms.

Muir's person was not illegally seized; and that her consent was not the product of illegal seizure, duress, or coercion; and that she did, in fact, consent to the search of the safe.
Any questions?

RP (May 28, 2013) at 52–55.

After a bench trial on stipulated facts, Muir was convicted of possession of methamphetamine with intent to deliver. Muir appeals.

ANALYSIS

CrR 3.6 Findings

Muir argues the trial court's failure to enter written findings after the suppression hearing requires reversal or remand. We disagree. A court must enter written findings and conclusions following a suppression hearing. CrR 3.6(b). Those findings and conclusions are generally considered necessary for appellate review. State v. Head, 136 Wn.2d 619, 622-23, 964 P.2d 1187 (1998). We may overlook this failure where the court clearly and comprehensively states the basis of its opinions orally. State v. Cruz, 88 Wn. App. 905, 907-09, 946 P.2d 1229 (1997); State v. Smith, 68 Wn. App. 201, 208, 842 P.2d 494 (1992). Here, the trial court did not file written findings following the suppression hearing. But the record leaves no doubt that the court's oral ruling clearly and comprehensively explained the basis for its findings of fact and conclusions of law. Our review in this case is not hampered by the absence of written findings and conclusions.

Seizure

Muir contends, "[O]nce Elton asked or invited Muir to sit down and repeatedly asked to search the truck and the safe, the contact intruded into Muir's sphere of

privacy in violation of Article 1, § 7 of the Washington State Constitution." Appellant's Br. at 13.

It is a well-recognized rule that a warrantless search is per se unreasonable under both the Fourth Amendment and article I, section 7 of our state constitution unless the search falls within one or more specific exceptions to the warrant requirement. State v. Ross, 141 Wn.2d 304, 312, 4 P.3d 130 (2000).

Consent is one of the narrow exceptions to the Washington State Constitution's prohibition against warrantless searches. State v. Hendrickson, 129 Wn.2d 61, 71, 917 P.2d 563 (1996). For consent to be valid, the consent must be free and voluntary, the person consenting must have the authority to consent, and the search must not exceed the scope of consent. State v. Thompson, 151 Wn.2d 793, 803, 92 P.3d 228 (2004). If the free and voluntary character of the consent is challenged, the State must prove by clear and convincing evidence that the individual consented freely and voluntarily, not as a result of duress or coercion. State v. Smith, 115 Wn.2d 775, 789, 801 P.2d 975 (1990). Clear and convincing evidence exists when the evidence shows the ultimate fact at issue to be highly probable. In re Dependency of K.S.C., 137 Wn.2d 918, 925, 976 P.2d 113 (1999).

The voluntariness of a consent to search is a question of fact to be determined by considering the totality of the circumstances surrounding the alleged consent. State v. Shoemaker, 85 Wn.2d 207, 211-12, 533 P.2d 123 (1975). An illegal seizure may vitiate voluntary consent. See State v. Armenta, 134 Wn.2d 1, 16-17, 948 P.2d 1280 (1997).

Whether the police have seized a person is a mixed question of law and fact. State v. Harrington, 167 Wn.2d 656, 662, 222 P.3d 92 (2009). Challenged findings entered after a suppression hearing that are supported by substantial evidence are binding, and where the findings are unchallenged, they are verities on appeal. State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003). Muir does not challenge that substantial evidence supports the trial court's findings of fact. We therefore treat the court's findings as verities. We review conclusions of law entered by the trial court at a suppression hearing de novo. State v. Carter, 151 Wn.2d 118, 125, 85 P.3d 887 (2004).

Under the Fourth Amendment, a person is seized if, considering all the circumstances, a reasonable person would have believed that he was not free to leave.[2] Under article I, section 7, a person is seized only when, by means of physical force or a show of authority, his or her freedom of movement is restrained and a reasonable person would not have believed he or she is (1) free to leave, given all the circumstances, State v. Young, 135 Wn.2d 498, 510, 957 P.2d 681 (1998), or (2) free to otherwise decline an officer's request and terminate the encounter.[3] See Florida v. Bostick, 501 U.S. 429, 436, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991); State v. Thorn, 129 Wn.2d 347, 352, 917 P.2d 108 (1996), overruled on other grounds by State v.

---

[2] The Fourth Amendment to the United States Constitution states, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. amend. IV.

[3] Article I, section 7 of the Washington Constitution states, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

O'Neill, 148 Wn.2d 564, 62 P.3d 489 (2003). Whether a reasonable person would believe he was detained depends on the particular, objective facts surrounding the encounter. State v. Ellwood, 52 Wn. App. 70, 73, 757 P.2d 547 (1988) (citing United States v. Mendenhall, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)).

The Supreme Court discussed a nonexclusive list of police actions likely to result in a seizure, including "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Mendenhall, 446 U.S. at 554-55. Washington courts often rely on these factors to determine whether a seizure occurred. E.g., Harrington, 167 Wn.2d at 666; Young, 135 Wn.2d at 512 (1998).

Muir argues that she was seized through a progressive intrusion into her privacy relying on State v. Soto-Garcia, 68 Wn. App. 20, 841 P.2d 1271 (1992), and Harrington, 167 Wn.2d 656. We disagree.

In Soto-Garcia, a Kelso Police Officer questioned the defendant after seeing him walk out of an alley at night. The officer pulled his car to the side of the road and Soto-Garcia voluntarily approached. The officer asked where Soto-Garcia was coming from and where he was going. Soto-Garcia answered these questions appropriately. The officer asked for Soto-Garcia's name and he handed over a driver's license. The officer ran an identification check in Soto-Garcia's presence. The officer asked if he had any cocaine and Soto-Garcia said he did not. The officer asked to search him. Soto-Garcia responded, "'Sure, go ahead.'" The officer reached into Soto-Garcia's shirt pocket and found cocaine. Soto-Garcia, 68 Wn. App. at 22. The court concluded that the

atmosphere created by the officer's "progressive intrusion" was of such a nature that a reasonable person would not have felt free to leave. <u>Soto-Garcia</u>, 68 Wn. App. at 25. The court held that when the officer asked Soto-Garcia if he had any cocaine he was seized. <u>Soto-Garcia</u>, 68 Wn. App. at 25.

In <u>Harrington</u>, the court concluded that an officer's actions amounted to a progressive intrusion that seized the defendant. <u>Harrington</u>, 167 Wn.2d at 669-70. There, a police officer made a U-turn, got out of his patrol car, and approached Harrington at night as he walked down the sidewalk. The officer questioned Harrington about his activities and travel. A second officer suddenly arrived on the scene in a patrol car and stood seven or eight feet from Harrington. The first officer requested that Harrington remove his hands from his pockets. He then asked for consent to frisk. The court noted, "Requesting to frisk is inconsistent with a mere social contact." <u>Harrington</u>, 167 Wn.2d at 669. The court held that when the officer requested to frisk Harrington, "the officers' series of actions matured into a progressive intrusion substantial enough to seize Harrington. A reasonable person would not have felt free to leave due to the officers' display of authority." <u>Harrington</u>, 167 Wn.2d at 669-70.

But not every encounter between an officer and a citizen creates a seizure. <u>Armenta</u>, 134 Wn.2d at 10. An officer may engage a person in conversation in a public place and ask for identification without seizing that person. <u>Armenta</u> 134 Wn.2d at 11. A police officer does not seize a person merely by approaching him in a public place and asking questions as long as the person need not answer and can walk away. <u>State v. Thomas</u>, 91 Wn. App. 195, 200, 955 P.2d 420 (1998). For example, a defendant was not seized when an officer approached him in a parking lot and asked,

"Where is the pipe?" Thorn, 129 Wn.2d at 354. Here, Detective Elton's actions did not constitute a "progressive intrusion" into Muir's privacy. Without issuing any commands or attempting to control Muir, Detective Elton asked Muir for permission to perform a routine search of a truck Muir's boyfriend owned. Indeed, she initially told Detective Elton to ask McIntyre for consent. Muir later agreed to allow the search, but she was equally free to decline and walk away.

In State v. Smith, 154 Wn. App. 695, 226 P.3d 195 (2010), the court found no seizure occurred where multiple armed officers were present, an officer asked the defendant for his name, performed a warrants check, asked him for ID, asked for another form of ID, requested consent to search the defendant's wallet, searched the wallet, and found methamphetamine. The Smith court distinguished Soto-Garcia on grounds that the officer asked the defendant a direct question about drug possession. The Smith court distinguished Harrington on the grounds that the officer there asked the defendant to remove his hands from his pockets to control his actions. Smith, 154 Wn. App. at 701-02. Further, in Harrington and Soto-Garcia, the progressive intrusion into the defendant's privacy lead to a request to frisk—an action that is inconsistent with mere social contact.

As in Smith, Detective Elton made no attempt to control Muir's actions, asked her no direct questions about whether she possessed drugs, and made no request to search her.

Detective Elton left Muir unattended and out of sight on the sidewalk while he spoke to McIntyre.[4] As the trial court recognized, "it's not a true custodial interrogation or custodial matter when the officer walks off and he's outside your view. I would think of no clearer invitation to walk off." RP at 54. Furthermore, none of the factors often associated with a seizure were present here. See Young, 135 Wn.2d at 512 (citing Mendenhall, 446 U.S. at 554-55). There was no threatening presence of multiple officers, no display of weapons, no physical touching, and no language or tone of voice to indicate compliance might be compelled. And Muir's contact with Detective Elton before he opened the safe lasted only 10 to 15 minutes.

Muir maintains that when Detective Elton searched the safe, her personal property was retained, seizing her and requiring Detective Elton to provide Miranda warnings. See Armenta, 134 Wn.2d at 6, 12 (concluding that a seizure occurred when officer placed defendant's money in his patrol car); Thomas, 91 Wn. App. at 200-01 (concluding that a seizure occurred when officer took defendant's identification with him to perform a warrants check); Appellant's Br. at 7-8. But Detective Elton never removed Muir's property from her presence. After obtaining her consent, he searched her safe as she stood nearby. Muir was free to decline his request as established by the record facts here and her statement that she felt free to leave the scene without the truck.

As the State argues, the only question Detective Elton asked directly implicating Muir or her property before her arrest was the request to search the safe. Resp't's Br.

---

[4] The record shows that Muir testified that when Detective Elton left to talk to McIntyre, "[Elton] was out of my view, and I didn't know where he had gone." She also testified that when he asked for consent the second time, "[Elton] had left out of my view. . . ." RP (May 28, 2013) at 33.

at 20. Detective Elton's actions, viewed objectively and in their entirety, did not constitute a show of authority amounting to a seizure before Muir consented to the search of her safe.

Finally, we are not persuaded by Muir's argument that Detective Elton controlled her actions and her purse after she consented to its search.[5] The search occurred after she was formally arrested and read Miranda rights.

Because substantial evidence supports the trial court's factual findings and the findings support the court's conclusion that no invalid seizure occurred and Muir's consent to search the safe was free and voluntary, we affirm the judgment and sentence.

WE CONCUR:

---

[5] The undisputed evidence shows no officers directed her to place the purse on the ground. The first time officers touched the purse occurred after Muir was arrested during a search incident to that arrest.