# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>        Appellant,<br><br>        v.<br><br>LOUIS EARL JOHNSON JR.,<br><br>        Respondent. | DIVISION ONE<br><br>No. 77720-3-I<br><br>PUBLISHED OPINION<br><br>FILED: May 6, 2019 |

DWYER, J. — Our society and the law that reflects its organizing principles assume that citizens will trust law enforcement and believe the things that police officers tell them. For instance, when a police officer enters a schoolhouse and announces that an active shooter is nearby, society desires that those so informed believe the officer and act accordingly. Similarly, when a homeowner is awakened in the night by a police officer at the front door who announces that a wildfire is fast approaching, society desires that the officer be believed and that the homeowner acts accordingly. Indeed, examples of this societal desire seem endless.

Nevertheless, case law makes clear that a police officer, in the course of investigating criminality, does not violate either the federal or state constitution by lying to a potential suspect or witness. The need to sometimes do so has been repeatedly accommodated by the courts. But when police officers do choose to lie, they must recognize and accept the logical consequences of that decision.

One such consequence arises in the context of constitutional seizure

analysis. This jurisprudence provides that, in a police-citizen encounter, no seizure of the person occurs unless—objectively viewed and under the totality of the circumstances—a reasonable person would not believe that he or she was free to terminate the encounter or decline the officer's requests. In analyzing the circumstances of such an encounter, a reasonable person is an innocent person. And reasonable innocent persons may be assumed to believe the truth of that which the police tell them.

In this case, Louis Johnson Jr. was found to be in unlawful possession of a firearm. Prior to that discovery, however, the police encounter with him had reached the point where—under the totality of the circumstances and objectively viewed—he had been seized. And, at the time of his seizure, the police lacked a lawful basis to seize him. Thus, the trial court properly granted his motion to suppress evidence of the gun found in his possession. We affirm.

I

Two Lynnwood police officers, Zach Yates and James George, were engaged in a proactive patrol late at night in an area known to have a high rate of criminal activity. The officers observed a silver vehicle enter a motel parking lot and park in a stall. After the vehicle came to rest, about a minute and a half passed without any person entering or leaving the vehicle. The officers became suspicious that its occupants were using drugs.

The officers, both of whom were armed and in uniform, approached the vehicle on foot and stood on opposite sides adjacent to the driver's and passenger's doors. They shined flashlights into the vehicle's interior to enable

them to see the vehicle's occupants and ensure that neither was holding anything that could put the officers in danger. Because the vehicle was also flanked on both sides by cars parked in adjoining stalls, the officers had minimal space to move. Officer Yates did not see any drugs or drug paraphernalia when he shined his flashlight inside the passenger compartment. Inside were Johnson and a female passenger.

Officer Yates stood on the passenger side while Officer George stood adjacent to the driver's door. Yates sought to start a conversation with Johnson, who was in the driver's seat, and did so by asking, "Hey, is this Taylor's vehicle?" In fact, there was no "Taylor"; the ruse was intended to make Johnson feel more comfortable, in the hope that he would talk with the officer. Johnson appeared confused by the question, and Yates asked, again, whether the vehicle was "Taylor Smith's vehicle." In response, Johnson stated that the vehicle was his own and that he had recently purchased it.

Yates then asked for Johnson's name, whether Johnson had a driver's license, and if he would mind whether the officer looked at it. When Johnson stated that he had an identification card, both officers became suspicious that his license might be suspended. Officer Yates received the identification card from Johnson and used information from it to request a check of Johnson's warrant history and license status from police dispatch. Meanwhile, Officer George, who was leaning over the driver's side door, noticed a handgun placed between the driver's seat and the door.

George alerted Yates to the presence of the firearm, drew his own

handgun, opened the driver's door and removed the weapon from Johnson's vehicle. Subsequently, Johnson was removed from the vehicle. Meanwhile, police dispatch informed the officers that Johnson's driver's license was suspended in the third degree, and that he had an outstanding arrest warrant and a felony conviction. The officers then informed Johnson that he was being detained but not placed under arrest and advised him of his Miranda[1] rights.

Eventually, Johnson was charged with unlawful possession of a firearm in the first degree. Before trial, Johnson moved to suppress the evidence of the gun found in his possession, contending that it was found attendant to his unlawful seizure. After an evidentiary hearing, the trial court granted Johnson's motion. However, the judge did not make a determination as to whether Johnson was seized prior to the discovery and removal of the firearm, instead ruling that the encounter was a "social contact" and that "law enforcement had an insufficient basis to initiate a social contact." The trial court further acknowledged that granting the motion to suppress essentially terminated the State's case. The State appeals from the order granting Johnson's motion.

II

The State challenges the trial court's ruling that the police officers had an "insufficient basis" to initiate a social contact with Johnson. The State asserts, correctly, that there is no constitutional requirement for police officers to have articulable reasons for simply engaging in conversation with members of the public. Johnson does not dispute this but, rather, insists that the encounter

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

became a seizure commenced without a lawful basis. He asks that we affirm the suppression order on this ground, as we may affirm a trial court decision on any basis supported by the evidence and the record. State v. Rafay, 167 Wn.2d 644, 655, 222 P.3d 86 (2009) (citing State v. Rohrich, 149 Wn.2d 647, 654, 71 P.3d 638 (2003)). For its part, the State asserts that the encounter was a social contact, rather than a seizure, because none of the officers' actions or statements prior to the discovery of the firearm amounted to a show of authority that would cause a reasonable person to feel not free to leave the scene or to disregard the officers' requests. Johnson's analysis of the encounter is well-taken.

A

In a constitutional sense, the term "social contact" is meaningless. The term has been adopted by lawyers and judges to describe circumstances that do not amount to a seizure. But it never matters whether an encounter can be called a social contact. In seizure analysis, what matters is whether a person is seized. If not, the inquiry ends regardless of whether the encounter can be said to have been a social contact. If so, the requirements for a lawful seizure apply—again without concern for any claimed "social" purpose for the "contact."

To be sure, "social contact" discussions have entered our case law. In such discussions, a social contact is said to rest "someplace between an officer's saying 'hello' to a stranger on the street and, at the other end of the spectrum, an investigative detention (i.e., Terry stop)." State v. Harrington, 167 Wn.2d 656, 664, 222 P.3d 92 (2009) (citing Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L.

- 5 -

Ed. 2d 889 (1968)). "The term 'social contact' does not suggest an investigative component." Harrington, 167 Wn.2d at 664.

Fortunately, seizure jurisprudence is well-developed. "Article I, section 7 does not forbid social contacts between police and citizens: '[A] police officer's conduct in engaging a defendant in conversation in a public place and asking for identification does not, alone, raise the encounter to an investigative detention.'" State v. Young, 135 Wn.2d 498, 511, 957 P.2d 681 (1998) (alteration in original) (quoting State v. Armenta, 134 Wn.2d 1, 11, 948 P.2d 1280 (1997)). "'[N]ot every encounter between a police officer and a citizen is an intrusion requiring an objective justification.'" Young, 135 Wn.2d at 511 (quoting United States v. Mendenhall, 446 U.S. 544, 553, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)). Thus, "the police are permitted to engage persons in conversation and ask for identification even in the absence of an articulable suspicion of wrongdoing." Young, 135 Wn.2d at 511. Moreover, "[w]hile most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." Immigration & Naturalization Serv. v. Delgado, 466 U.S. 210, 216, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984).

A sufficient suspicion of wrongdoing, meanwhile, is required only to justify a seizure. As stated, a social contact is simply a term for an encounter that does not amount to a seizure.[2] Thus, to determine whether such justification was

---

[2] Of course, an encounter that begins as other than a seizure may become a seizure. When engaged in a totality of the circumstances analysis, a tipping point may be reached whereby the cumulative weight of the circumstances leads from one conclusion (no seizure) to the other (seizure). See Harrington, 167 Wn.2d at 660.

lacking in Johnson's situation, we must first determine when Johnson was seized.

"Whether police have seized a person is a mixed question of law and fact." Harrington, 167 Wn.2d at 662. "The rule in Washington is that challenged findings entered after a suppression hearing that are supported by substantial evidence are binding, and, where the findings are unchallenged, they are verities on appeal." State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003).

> Under article I, section 7, a person is seized "'only when, by means of physical force or a show of authority,'" his or her freedom of movement is restrained and a reasonable person would not have believed he or she is (1) free to leave, given all the circumstances, State v. Young, 135 Wn.2d 498, 510, 957 P.2d 681 (1998) (quoting State v. Stroud, 30 Wn. App. 392, 394-95, 634 P.2d 316 (1981) and citing United States v. Mendenhall, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)), or (2) free to otherwise decline an officer's request and terminate the encounter, see Florida v. Bostick, 501 U.S. 429, 436, 111 S. Ct. 2382, 115 L.Ed.2d 389 (1991); [State v.] Thorn, 129 Wn.2d [347,] 352[, 917 P.2d 108 (1996), overruled on other grounds by State v. O'Neill, 148 Wn.2d 564]. The standard is [] "a purely *objective* one, looking to the actions of the law enforcement officer." Young, 135 Wn.2d at 501 (emphasis added).

O'Neill, 148 Wn.2d at 574.

"[T]he 'reasonable person' test presupposes an *innocent* person." Bostick, 501 U.S. at 438. "The Constitution does not require the utilization of an objective 'reasonable criminal' test." State v. Butler, 2 Wn. App. 2d 549, 556 n.1, 411 P.3d 393 (2018).

The defendant "bears the burden of proving a seizure occurred in violation of article I, section 7." Harrington, 167 Wn.2d at 664; accord O'Neill, 148 Wn.2d at 574. As the United States Supreme Court has observed,

Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free "to disregard the police and go about his business," California v. Hodari D., 499 U.S. 621, 628[, 111 S. Ct. 1547, 113 L. Ed. 2d 690] (1991), the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature. The Court made precisely this point in Terry v. Ohio, 392 U.S. [at] 19, n.16 (1968): "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."

Bostick, 501 U.S. at 434.

Washington courts have adopted the Mendenhall test of a seizure to analyze a disturbance of a person's private affairs under our state constitution.

A person is "seized" within the meaning of the Fourth Amendment only when, by means of physical force or a show of authority, his freedom of movement is restrained. . . . There is a "seizure" when, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.

State v. Stroud, 30 Wn. App. 392, 394-95, 634 P.2d 316 (1981) (footnote omitted) (citing United States v. Mendenhall, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980), review denied, 96 Wn.2d 1025 (1982); accord State v. Thorn, 129 Wn.2d 347, 351-52, 917 P.2d 108 (1996).

Washington search and seizure law stemming from Terry and proceeding through Mendenhall is well-established.

Young, 135 Wn.2d at 510 (alteration in original).

In Young, our Supreme Court confirmed that Mendenhall's approach to Fourth Amendment seizure analysis remains applicable to article I, section 7 seizure analysis.

"Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening

presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. . . . In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person."

Young, 135 Wn.2d at 512 (alteration in original) (quoting Mendenhall, 446 U.S. at 554-55). Our Supreme Court continues to apply the Mendenhall formulation to state constitutional seizure analysis, see, e.g., Harrington, 167 Wn.2d at 664; State v. Rankin, 151 Wn.2d 689, 695, 92 P.3d 202 (2004); O'Neill, 148 Wn.2d at 574, as do we. See, e.g., Butler, 2 Wn. App. 2d at 561; State v. Mote, 129 Wn. App. 276, 283, 120 P.3d 596 (2005).[3]

Seizure analysis under the federal and state constitutions differs in only one pertinent respect. "In Young, Washington adopted the test for Fourth Amendment 'seizure' in United States v. Mendenhall, as the test for seizure analysis under Washington Constitution article I, section 7." Rankin, 151 Wn.2d at 710 (Ireland, J., dissenting) (citations omitted). However, after Mendenhall, the United States Supreme Court held that a seizure for purposes of the Fourth Amendment can occur only where the subject actually yields to an officer's physical force or show of authority. Hodari D., 499 U.S. at 626-28.

Subsequently, our Supreme Court rejected the application of this test to article I, section 7 seizure analysis, instead applying a purely objective standard, Young, 135 Wn.2d at 509-11, which focuses not on whether the subject perceived that he or she was being ordered to restrict his or her movement but,

---

[3] "In a challenge to the validity of a Terry stop, article 1, section 7 generally tracks the Fourth Amendment analysis." State v. Z.U.E., 183 Wn.2d 610, 617, 352 P.3d 796 (2015).

rather, on whether the officer's words and actions would have conveyed that meaning to a reasonable person. Young, 135 Wn.2d at 506. Thus, cases applying Fourth Amendment seizure analysis continue to be applicable to an article I, section 7 analysis, so long as they do not involve an application of the Hodari D. "subjectivity" test.

Several Washington cases applying this seizure analysis guide our thinking. Johnson was the occupant of an automobile parked in a public place. As such, he was constitutionally indistinguishable from a pedestrian. O'Neill, 148 Wn.2d at 579.

In Thorn, 129 Wn.2d 347, a suspect in a parked vehicle in an otherwise empty lot was found not to have been seized when asked an accusatory question by a lone police officer. As described therein,

> While on routine patrol in a marked patrol car shortly after midnight, Spokane Police Officer K. Peden observed three people seated in a car that was legally parked in the parking lot of Friendship Park in suburban Spokane. The officer also observed a flicker of light emanate from within the parked car and believed that the light was a flame being used to ignite a drug pipe . . . .
> Officer Peden stopped, exited the patrol car, and approached the parked car on foot. The officer asked the driver of the parked car, "Where is the pipe?" . . . . In response to the question, the driver, James Thorn, removed a pipe from his coat pocket and handed it to Officer Peden.

Thorn, 129 Wn.2d at 349. Psilocybin mushrooms, a controlled substance, were discovered in a subsequent search incident to Thorn's arrest. Thorn, 129 Wn.2d at 349.

On appeal, Thorn claimed that he was illegally seized when the officer asked, "Where is the pipe?" The Supreme Court disagreed, citing Bostick and

- 10 -

Mendenhall for the proposition that an officer does not seize a person merely by striking up a conversation or asking questions. Thorn, 129 Wn.2d at 352.

The court noted that the required analytical approach was to consider the totality of the circumstances. Thorn, 129 Wn.2d at 352-53. The court concluded that the posing of the question, in the circumstances described, did not "create[] a coercive environment" such that Thorn was seized. Thorn, 129 Wn.2d at 354.[4]

However, officers need not create a complete obstruction of an individual's movements in order for the encounter to become a seizure. The test is whether a reasonable person faced with similar circumstances would feel free to leave or otherwise terminate the encounter. In this regard, an opinion from Division Two of our court, State v. Young, 167 Wn. App. 922, 275 P.3d 1150 (2012), is informative. In that case, two police officers exited separate patrol vehicles and followed Young into an alley behind a building, believing that she had been acting suspiciously. Young, 167 Wn. App. at 925-26. While Young was leaning against a wall, the officers approached her, stood five feet away from her at 45-degree angles, and asked for the last four digits of her Social Security number. Young, 167 Wn. App. at 926, 928. Using this information, the officers learned that Young had an outstanding arrest warrant. They then arrested her and, in a search incident to the arrest, found methamphetamines. Young, 167 Wn. App. at 926-27.

The trial court denied Young's suppression motion, reasoning that she had

---

[4] Thorn was decided on Fourth Amendment grounds. It did not, however, involve an application of the Hodari D. "subjectivity" test and, therefore, retains its validity for purposes of both state and federal constitutional analysis. Thorn, 129 Wn.2d at 351-52.

been free to leave and, thus, the encounter was not a seizure. Young, 167 Wn. App. at 927-28. Division Two reversed, holding that the contact became a seizure and not a consensual encounter, because "[a]ny reasonable person in Young's position, with her back to a wall and police officers on either side of her, would not have felt free to walk away without first answering the officers' questions." Young, 167 Wn. App. at 931.

B

We now analyze the circumstances presented herein in light of the foregoing discussion. Johnson was seated in a parked vehicle with a passenger at 2:00 in the morning. Because a grass median was in front of the vehicle, the vehicle could only have exited the stall by backing out. Two police officers approached Johnson's vehicle, with one standing on each side of the vehicle adjacent to the vehicle doors. Cars were parked in each of the adjoining spaces, limiting the space available for movement. The two uniformed officers approached the vehicle less than two minutes after it had been parked. The officers shined flashlights inside the passenger compartment. In the substantially full parking lot, with vehicles parked on either side of Johnson's vehicle, there was minimal space for either officer to move. Because the officers were standing adjacent to the vehicle's doors, neither Johnson nor his passenger would have been able to open the doors and walk from the vehicle without the officers moving or giving way. The testimony did not indicate whether any other people were present in the lot.

Officer Yates asked Johnson whether the vehicle belonged to "Taylor." When Johnson appeared confused by this question, the officer repeated the question, inquiring whether the vehicle belonged to "Taylor Smith." Johnson then stated that the vehicle was his and that he had recently purchased it. In response Officer Yates asked Johnson for his name. He then asked Johnson to prove his identity, by requesting his driver's license.

Although asking the question, "Is this Taylor's car?" was a ruse made for the sake of initiating a conversation, its effect on a reasonable person in these circumstances would be to create the impression that the police were conducting an ongoing investigation concerning the vehicle. Indeed, Johnson manifested confusion as a result of the question, likely because he had no reason to believe that the question was not sincere. The repetition of the question underscored its apparent sincerity. The further inquiries into Johnson's name, whether Johnson had a driver's license, and whether Johnson would prove his identity by presenting his identification document to Officer Yates further advanced the impression that a police investigation was ongoing and that Johnson was a suspect.

It is so that the police do not violate either the state or federal constitutions simply by lying to potential suspects or witnesses. Lewis v. United States, 385 U.S. 206, 208-09, 87 S. Ct. 424, 17 L. Ed. 2d 312 (1966); State v. Hashman, 46 Wn. App. 211, 216, 729 P.2d 651 (1986). Indeed, courts have repeatedly accommodated the legitimate law enforcement interest in employing subterfuge or untruths. State v. Hastings, 119 Wn.2d 229, 233, 830 P.2d 658 (1992); accord

State v. Johnson, 104 Wn. App. 489, 503, 17 P.3d 3 (2001). However, when the police do choose to lie, they must accept both the benefits and the detriments of that choice.

We have previously noted that the police are not required to distrust ordinary citizens, and "'[c]ourts are not required to sever the relationships that citizens and local police forces have forged to protect their communities from crime.'" State v. Lee, 147 Wn. App. 912, 919, 199 P.3d 445 (2008) (alteration in original) (quoting United States v. Christmas, 222 F.3d 141, 145 (4th Cir. 2000)). A corollary to this principle is that ordinary citizens are not required to distrust the police, and a reasonable innocent person is entitled to believe that he or she is being dealt with honestly by law enforcement. In the context of constitutional seizure jurisprudence, one consequence of a police lie is plain: whether a person has been seized is a purely objective inquiry; an objective inquiry focuses on the perceptions of a reasonable person; a reasonable person is an innocent person; and reasonable innocent people can be assumed to believe that which the police tell them.

Taken in their totality, the circumstances existing at the moment Officer Yates requested possession of Johnson's identification document would have caused a reasonable innocent person to believe that ignoring the officer's requests, terminating the encounter, or leaving the scene were not viable options. The sudden presence of two uniformed officers so soon after the vehicle had parked, the shining of flashlights into the vehicle, the question, repeated, as to whether the vehicle belonged to Taylor Smith, and the request for

the driver's name and proof of his identity would lead a reasonable innocent person to believe that the vehicle, and by extension its driver, was the subject of an ongoing criminal investigation.

Johnson was not at that time in the presence of other members of the public—the parking lot, although filled with vehicles, was not a scene of activity at 2:00 in the morning. The presence of two officers flanking the vehicle in a tight spot affording limited movement meant that neither Johnson nor his passenger would have been able to open a vehicle door and walk away from the vehicle without either making physical contact with an officer or requiring the officer to give way. Johnson also could not drive forward due to the berm. Neither could he move his vehicle in reverse without risking his car making contact with one or both of the officers. Indeed, such vehicle movement would likely seem—to a reasonable innocent person under the circumstances—to constitute an aggressive move of a type that would promote an aggressive response from the officers. The shining of flashlights by both officers, while possibly a benign practice by itself, would further a reasonable innocent person's impression that the police were conducting an active investigation centering on the vehicle. Finally, in addition to the ruse, the request for Johnson's name and for proof of his identity would indicate to a reasonable innocent person that the officers were unwilling to take that person at his word—either as to his statement concerning the vehicle's ownership or as to his identity.

A totality of the circumstances analysis is a cumulative analysis, not a "divide-and-conquer" analysis. See United States v. Arvizu, 534 U.S. 266, 274,

122 S. Ct. 744, 151 L. Ed. 2d 740 (2002); State v. Marcum, 149 Wn. App. 894, 907, 205 P.3d 969 (2009). Thus, the State's reliance on cases in which a single circumstance was deemed insufficient to constitute a seizure—be it the use of a flashlight in O'Neill, 148 Wn.2d at 578, the questioning of a suspect in a parked car in Mote, 129 Wn. App. at 289, or the request for a suspect's identification in Armenta, 134 Wn.2d at 11—is uncompelling.

Under the totality of the circumstances then existing, the request for proof of Johnson's identity became the tipping point at which the weight of the circumstances transformed a simple encounter into a seizure. At that stage of the encounter, a reasonable innocent person in Johnson's position would not have felt free to leave the scene, to disregard the officer's requests, to ignore the officers, or to otherwise terminate the encounter. See Young, 167 Wn. App. at 930-31. Johnson was seized at that time.[5]

III

Having determined that Johnson was seized and when he was seized, the next question is whether the seizure of Johnson was lawful. Johnson asserts that it was unlawful. We agree.

---

[5] Johnson, citing United States v. Smith, 794 F.3d 681 (7th Cir. 2015), also argues that we should consider racial dynamics as part of the totality of the circumstances, because Johnson, as a black man in a high-crime area, would not feel free to ignore the two white officers standing next to his vehicle. The court in Smith ultimately found that a seizure existed based on an objective reasonable person analysis without accounting for the defendant's race. Smith, 794 F.3d at 687-88. The standard utilized to determine whether a seizure took place is an objective one, based on a reasonable innocent person's perceptions—not the subjective impressions of the defendant. While we would not assert that race could never be a factor, here it is clear that the officers had no idea as to Johnson's race when they made the decision to initiate the encounter.

Warrantless seizures are presumed to be unlawful and the State bears the burden of proving that a seizure falls within an exception to the warrant requirement. Z.U.E., 183 Wn.2d at 617. The authority for a warrantless investigative detention is derived from Terry v. Ohio, 392 U.S. at 21. State v. Kennedy, 107 Wn.2d 1, 5-6, 726 P.2d 445 (1986). A Terry stop is justified if an officer can articulate a reasonable suspicion that the person stopped has been or is about to be involved in criminal activity. State v. Acrey, 148 Wn.2d 738, 746-47, 64 P.3d 594 (2003). A reasonable suspicion must "be grounded in 'specific and articulable facts.'" Z.U.E., 183 Wn.2d at 617 (quoting Terry, 392 U.S. at 21). An investigative detention cannot be predicated upon speculation or "mere hunches." State v. Doughty, 170 Wn.2d 57, 63, 239 P.3d 573 (2010); accord State v. Larson, 93 Wn.2d 638, 643, 611 P.2d 771 (1980); see also State v. Fuentes, 183 Wn.2d 149, 161, 352 P.3d 152 (2015) ("An officer's hunch does not justify a stop."); State v. Gatewood, 163 Wn.2d 534, 542, 182 P.3d 426 (2008) ("Officers seized Gatewood to conduct a speculative criminal investigation. Our constitution protects against such warrantless seizures and requires more for a Terry stop."). Furthermore, under article I, section 7, the facts available to an officer must connect the seized person to the particular crime that the officer seeks to investigate. Z.U.E., 183 Wn.2d at 618.

A suspicion is reasonable when it is based upon the "substantial possibility that criminal conduct has occurred or is about to occur." Kennedy, 107 Wn.2d at 6. A reasonable suspicion analysis is based upon the totality of the circumstances, with officers being allowed to make inferences from known facts,

drawing on their experience and specialized training. Arvizu, 534 U.S. at 273; State v. Glover, 116 Wn.2d 509, 514, 806 P.2d 760 (1991). "[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." Illinois v. Wardlow, 528 U.S. 119, 125, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000); accord Lee, 147 Wn. App. at 917. Factors courts will look to in a totality of the circumstances analysis include, among others, the detaining officer's experience and training, the location of the investigatory detention, and the suspect's conduct. Glover, 116 Wn.2d at 514.

Several opinions illustrate circumstances which were, in their totality, insufficient to support reasonable suspicion. In State v. Richardson, 64 Wn. App. 693, 694, 825 P.2d 754 (1992), an officer was on patrol in an area known for high drug activity. He observed one individual who, over a period of several hours, acted in a manner suggestive of being a drug runner. This person absented himself whenever the officer approached. Richardson, 64 Wn. App. at 694. When the officer later saw Richardson walking with the suspected drug runner, he pulled up next to them and exited his patrol car. Richardson, 64 Wn. App. at 694-95. In short order, he asked the two men if he could talk to them, had them empty their pockets, and had them place their hands, along with whatever was in their pockets, on his patrol car. Richardson, 64 Wn. App. at 695. The officer subsequently searched Richardson's pockets and found cocaine. Richardson, 64 Wn. App. at 695.

The Court of Appeals held that the men were seized when the officer had them empty their pockets and place their hands on his vehicle. Richardson, 64

Wn. App. at 696. The court then analyzed whether reasonable suspicion existed to justify the seizure. The court observed that, based on existing case law, neither presence in a high crime area nor mere proximity to others independently suspected of criminal activity were sufficient to constitute reasonable suspicion. Richardson, 64 Wn. App. at 697. It then noted that these were the only things known to the officer at the time of the seizure. The officer had not overheard any conversation or seen any suspicious activity taking place between the men. Richardson, 64 Wn. App. at 697. The court concluded that the officer's suspicion was not reasonable and the seizure was unlawful. Richardson, 64 Wn. App. at 697.

Another opinion, State v. Doughty, 170 Wn.2d 57, is similarly informative. Therein, police stopped Doughty's vehicle after he was observed entering and exiting a house within a two-minute period around 3:20 a.m. Doughty, 170 Wn.2d at 59-60. The house was suspected of being a drug house based on an informant's tip and on complaints from neighbors of short-stay traffic. Doughty, 170 Wn.2d at 60. After stopping Doughty, a records check revealed to the officer that his driver's license was suspended. He was arrested. Doughty, 170 Wn.2d at 60. A search incident to this arrest revealed him to be in possession of methamphetamine. Doughty, 170 Wn.2d at 60.

Our Supreme Court concluded that the officer's decision to detain Doughty was based on the officer's "incomplete" observations. Doughty, 170 Wn.2d at 64. In holding that these observations were insufficient to justify seizing Doughty, the court reasoned,

> [P]olice never saw any of Doughty's interactions at the house. . . . The two-minute length of time Doughty spent at the house—albeit a suspected drug house—and the time of day do not justify the police's intrusion into his private affairs.

Doughty, 170 Wn.2d at 64.

In the wake of Doughty, the Court of Appeals applied that opinion's reasoning to an analogous set of facts in State v. Diluzio, 162 Wn. App. 585, 254 P.3d 218 (2011). There, an officer was on patrol in the late evening in a high crime area known for prostitution. Diluzio, 162 Wn. App. at 589. No bus stops existed in the area and no businesses were open at that hour, nor were any residences nearby. Diluzio, 162 Wn. App. at 589, 593. The officer saw Diluzio's vehicle stopping on the side of the road, where Diluzio, still in his vehicle, spoke with a female pedestrian. Diluzio, 162 Wn. App. at 588-89. The pedestrian then entered the vehicle. Diluzio, 162 Wn. App. at 589.

Subsequently, the officer stopped the vehicle. After asking Diluzio for his identification, he learned of an outstanding warrant for Diluzio's arrest. The officer arrested Diluzio and a search incident to this arrest yielded methamphetamine and heroin. Diluzio, 162 Wn. App. at 589. In its decision, the appellate court noted that the officer only observed Diluzio talking with a woman before allowing her into his vehicle—the officer did not act on any tip, overhear any conversation, or see any money change hands. Diluzio, 162 Wn. App. at 593. The court concluded,

> Even with the officer's 13 years of experience, the location of the stop, and the lack of open businesses or residences, the totality of the circumstances do not support a conclusion of a reasonable suspicion of criminal activity.

Diluzio, 162 Wn. App. at 593.

The period of observation before Officers Yates and George chose to approach Johnson was less than two minutes. In those two minutes, the following was known to the officers: the immediate area—the Rodeo Inn parking lot—was in a high crime area and Johnson parked and remained in his vehicle for over one minute. In the officers' experience, they testified, people who remained in parked vehicles could be using illegal drugs. This is a generalization that amounts to nothing more than a hunch. When the officers approached the vehicle and initiated a conversation with Johnson, they saw him seated with a female passenger. Neither officer observed any signs of drug use. Johnson was cooperative with Officer Yates and answered his questions. Beyond the aforementioned hunch, the officers were aware of nothing that constituted a reasonable, articulable suspicion of potential criminal activity.

Thus, the seizure was unlawful. The trial court did not err in granting Johnson's motion to suppress evidence of the subsequently discovered firearm.

Affirmed.

We concur:

- 21 -