**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 85024-5-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| PAUL ALVIN KLEVER, | |
| Appellant. | |

FELDMAN, J. — Paul Klever appeals his 2022 conviction of Possession of a Controlled Substance with Intent to Deliver. Klever argues (a) the trial court erred in denying his motion to suppress the evidence found in his truck on the evening of his arrest, (b) the trial court violated his constitutional right to a public trial when it conducted five unrecorded and unmemorialized sidebars during jury selection, and (c) the trial court improperly ordered him to pay a Victim Penalty Assessment (VPA) and community custody supervision fees. Regarding Klever's first argument, we affirm the trial court's order denying Klever's motion. Regarding the second argument, we reverse and remand. Regarding the third argument, we remand to the trial court to strike the VPA and community custody supervision fees.

I

The law enforcement encounter at issue in this appeal occurred in the

evening of November 7, 2019. While on patrol, Deputy Erik Strand followed Klever's truck into an abandoned lot where Klever had parked. Deputy Strand did not use his lights or siren. Deputy Strand followed Klever into the lot because he found it odd that Klever had "quickly" pulled off the road. Deputy Strand parked his vehicle 30-40 feet away from Klever, making sure not to block Klever's ability to exit the lot. Deputy Strand did not recognize Klever or Klever's vehicle while following Klever into the lot.

Deputy Strand exited his vehicle and approached Klever's truck on foot. Once Deputy Strand reached the truck, he recognized Klever from prior contacts. Deputy Strand asked Klever what he was doing, and Klever responded that he had thought Deputy Strand was going to pull him over. When asked if he had seen any emergency lights, Klever answered no.

Although Deputy Strand knew who Klever was, he asked Klever to identify himself to see whether Klever would answer truthfully, which Klever did. Deputy Strand then remembered that Klever's driver's license had been suspended at some point in the past and asked Klever if his license was still suspended. Klever answered that it was. At that point, Deputy Strand's partner, Deputy Weatherby, arrived at the scene, and Klever was arrested for driving with a suspended license.

Deputy Strand asked for Klever's consent to search the truck, but Klever said no. At some point during this encounter, Deputy Strand called for a nearby K9 officer who arrived at the scene within five minutes of Deputy Strand's initial contact with Klever. The K9 officer performed a "sniff" test around Klever's truck

2

and "indicated the odor of narcotics from the car." The sniff test took place while Klever, who was handcuffed, watched from beside Deputy Strand's vehicle.

Deputy Strand then asked Klever again for his consent to search the truck, and this time Klever said yes. Klever also informed the officers that they would find about a quarter ounce of methamphetamine in the tool box in his truck. Consistent with Klever's representation, the officers found what appeared to be methamphetamine, as well as a digital scale and "baggies," in a black bag in a tool box in Klever's truck.

Klever was charged with possession of methamphetamine with the intent to distribute in violation of RCW 69.50.401(1) and (2)(b). He subsequently filed a motion to suppress pursuant to CrR 3.6. In his motion, Klever argued, among other things, that Deputy Strand had unlawfully seized him when Deputy Strand asked him to identify himself and whether his license was still suspended.

The court scheduled an evidentiary hearing in accordance with CrR 3.6(b). At the hearing, Deputy Strand was the only witness who testified. When asked on direct examination to describe his conversation with Klever, Deputy Strand testified,

> So I asked him, hey, you know, hey, who you? And he's like, oh, I'm Paul Klever and I then asked him, hey, is your license still suspended? And he said it was and I hadn't verified it in the last, you know, I knew of him to be suspended and, um, in the past but I hadn't verified it recently.

Then, on cross-examination, when asked how he knew Klever, Deputy Strand responded,

> Ah, well, I've – Deputy Weatherby and I have contacted him on traffic stops and arrested him for DWLS third. Earlier in the year I had been involved with a – he allowed us to search his car and we referred for

3

narcotics out of his car. He is just known to us. He is one of our people that we have a lot of contacts with, um, of where he was living at the time, um, with his son, um, so he is just very well known to law enforcement.

Deputy Strand was not asked, and did not indicate, how or when he learned that Klever's driver's license had been suspended.

At the conclusion of the hearing, the trial court denied Klever's motion to suppress and directed the State to prepare a written ruling. The trial court subsequently entered the following findings of fact, conclusions of law, and order:

## I. FINDINGS OF FACT

1. Deputy Strand testified that he followed the Defendant's vehicle into an abandoned parking lot because, based on his training and experience, he believed it was an unusual behavior. At no time were the emergency lights or sirens activated on the deputy's vehicle.

2. Deputy Strand did not block the Defendant's vehicle from leaving and parked his vehicle at a distance from the Defendant's.

3. Only upon approaching the vehicle did the deputy recognize the Defendant from prior contacts. He immediately learned from the Defendant that he [was] driving on a suspended license, which he confirmed through dispatch.

4. Defendant was placed under arrest for driving on a suspended license in the third degree.

5. Within five minutes of the arrest a K9 officer arrived on scene. Under the circumstances this brief passage of time was not excessive.

## II. CONCLUSIONS OF LAW

1. Deputy Strand did not perform a traffic stop on Defendant's vehicle.

2. Deputy Strand's initial contact with the Defendant was a social contact. He was not seized prior to arrest.

4

3. The passage of time between the Defendant's arrest and arrival of the K9 officer was not unreasonable and so excessive that this became an unlawful seizure.

**ORDER**

It is hereby ordered, adjudged, and decreed that Defendant's Motion to Suppress Evidence Pursuant to CrR 3.6 is DENIED.

Klever's attorney approved the written ruling "as to form" and did not request any different or additional findings.

The case then proceeded to trial. Relevant to Klever's public trial argument here, the trial court conducted five separate sidebars during jury selection—none of which was recorded or transcribed. In the absence of any such contemporaneous memorialization, the report of proceedings indicates with regard to each sidebar: "(Sidebar was had.)"

Later in the proceeding, the trial court appears to have memorialized one of the sidebars. The court stated:

> Oh, let me just, I want to make a record. I have this peremptory challenge log, which I've dated and signed so I'm going to have that filed as a part of the record to reflect the challenges that were made. I will add for our record here that as to the alternates the parties, the alternate was first identified as Juror No. 27, the parties were each given an opportunity to pose an additional objection to that particular juror. Neither party chose to make an objection or make a challenge.
>
> Then we, after it was pointed out by madam clerk that the numbering was off, we identified Juror No. 26 instead as the alternate juror and each party, again, was given an opportunity to propose a challenge to that particular juror and neither party made a challenge to that juror.
>
> All right. Anything, any further supplementing of the record that needs to be done?

Both attorneys responded no.

Klever was convicted of possession of a controlled substance with intent to distribute and sentenced to 20 months confinement as well as 20 months in community custody. His sentence included a $500 VPA and community custody fees. This timely appeal followed.

II

**A.     Motion to Suppress**

Klever argues that the trial court erred in denying his motion to suppress the evidence found in his truck on the evening of his arrest. We disagree.

Article I, section 7 of the Washington Constitution provides, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." "'[A] seizure occurs, under article I, section 7, when considering all the circumstances, an individual's freedom of movement is restrained and the individual would not believe [they are] free to leave or decline a request due to an officer's use of force or display of authority.'" *State v. Sum*, 199 Wn.2d 627, 636, 511 P.3d 92 (2022) (quoting *State v. Rankin*, 151 Wn.2d 689, 695, 92 P.3d 202 (2004)). "'This determination is made by objectively looking at the actions of the law enforcement officer.'" *Id*. (citing *Rankin*, 151 Wn.2d at 695).

"Whether police have seized a person is a mixed question of law and fact." *State v. Harrington*, 167 Wn.2d 656, 662, 222 P.3d 92 (2009). "A trial court's conclusions of law on a motion to suppress evidence are reviewed de novo," and any "[u]nchallenged findings of fact are treated as verities on appeal." *State v. Valdez*, 167 Wn.2d 761, 767, 224 P.3d 751 (2009). Because we are reviewing a claim of unlawful seizure, we must first determine whether and when Klever was

seized. *State v. Johnson*, 8 Wn. App. 2d 728, 737, 440 P.3d 1032 (2019). As the defendant, Klever bears the burden of proving that a seizure occurred. *Id.*

Klever assigns error to the trial court's conclusion that "Deputy Strand's initial contact with the Defendant was a social contact. He was not seized prior to arrest." Focusing first on the trial court's conclusion that "Deputy Strand's initial contact with the Defendant was a social contact," we have previously explained that, "In a constitutional sense, the term 'social contact' is meaningless" and that "it never matters whether an encounter can be called a social contact." *Id.* at 735. Instead, "what matters is whether a person is seized. If not, the inquiry ends regardless of whether the encounter can be said to have been a social contact. If so, the requirements for a lawful seizure apply—again without concern for any claimed 'social' purpose for the 'contact.'" *Id.* Here too, the term social contact is meaningless to a proper constitutional analysis.

Turning to the relevant legal determination—whether and when Klever was seized—an encounter rises to the level of a seizure "'when, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Id.* at 738 (quoting *State v. Stroud*, 20 Wn. App. 392, 394-95, 634 P.2d 316 (1981)). A non-exhaustive list of factors that might indicate a seizure include: "'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *Id.* at 739 (quoting *State v. Young*, 135 Wn.2d 498, 512, 957 P.2d 681 (1998)). Recently, our Supreme Court clarified that

7

the defendant's race and ethnicity are among the circumstances that are relevant to the seizure inquiry. *See Sum*, 199 Wn.2d at 638-39.

The trial court's findings here indicate that "[a]t no time were the emergency lights or sirens activated on the deputy's vehicle," that "Deputy Strand did not block the Defendant's vehicle from leaving and parked his vehicle at a distance from the Defendant's," and that Deputy Strand "followed the Defendant's vehicle into an abandoned parking lot," where he "immediately learned from the Defendant that he [was] driving on a suspended license." In its oral decision, the court similarly found that the encounter occurred "in an abandoned lot" and that Deputy Strand "recognized that Mr. Klever might have a suspended license" and then "asked him . . . is your license still suspended[?]"[1] Despite Klever's burden to prove that a seizure occurred, these findings do not establish that Klever's freedom of movement was restrained and he would not believe he was "free to leave or decline a request due to an officer's use of force or display of authority.'" *Sum*, 199 Wn.2d at 636 (quoting *Rankin*, 151 Wn.2d at 695).

Given the trial court's minimal findings in this case, our Supreme Court's opinion in *State v. Thorn*, 129 Wn.2d 347, 917 P.2d 108 (1996), is directly on point. The parties in *Thorn* agreed to submit the case on stipulated facts. *Id*. at 349. As so stipulated by the parties, Spokane Police Officer K. Peden observed three people seated in a car that was legally parked in the parking lot of Friendship Park

---

[1] Where, as here, a trial court's written findings are sparse or nonexistent, we have held that "inadequate written findings may be supplemented by the trial court's oral decision or statements in the record." *State v. Teuber*, 109 Wn. App. 640, 646, 36 P.3d 1089 (2001) (citing *In re LaBelle*, 107 Wn.2d 196, 219, 728 P.2d 138 (1986)). Nor are any of these facts disputed; consistent with the trial court's written and oral findings, the State acknowledges in its briefing that Deputy Strand followed Klever "into a dark, empty parking lot," "walked up to the driver's side of the truck," and "asked Klever his name and then asked if Klever's license was still suspended."

in suburban Spokane. *Id.* Officer Peden also observed a flicker of light emanate from within the parked car and believed that the light was a flame being used to ignite a drug pipe. *Id.* Officer Peden then stopped to investigate, exited the patrol car, approached Thorn's parked car on foot, and asked Thorn, the driver of the car, "Where is the pipe?" *Id.* On this limited record, the trial court concluded that Thorn had been seized when Officer Peden asked him that accusatory question, and the court of appeals affirmed the trial court's determination. *Id.* at 349-50.

Our Supreme Court reversed. Relevant here, the court stated:

> The problem inherent in a case such as this one, presented on limited stipulated facts, is that the encounter is capable of varying interpretations. For example, did the officer approach and ask in a pleasant or joking tone of voice where the pipe might be or did the officer stride forcefully toward the car, impliedly demanding that Thorn respond? From the bare facts of the stipulation, we know only that the officer asked a question. Thorn presented no facts about the encounter on which to base a determination that the circumstances were such that a reasonable person would not feel free to ignore the question. If there was something about the question, or the manner in which it was asked, that was coercive, there was insufficient evidence for the trial court to ascertain this. Hence, we reject the trial court's implicit conclusion that the question itself, as a matter of law, created a coercive environment such that Thorn reasonably believed that he could not leave.

*Id.* at 353-54. The court emphasized that its "holding should not be construed as a blanket rule that an officer does not seize a person merely by asking a question." *Id.* at 354. Nonetheless, "where the question is, as here, capable of more than one interpretation, it does not per se constitute a 'seizure.' The burden of proving that a seizure occurred is on Thorn." *Id.*

Much the same is true in this case. The trial court's findings, similar to the stipulated facts in *Thorn*, provide only "the bare facts." *Id.* at 353. We know that

Deputy Strand followed Klever into an abandoned parking lot, that he did not block Klever's truck from leaving, that he parked his vehicle at a distance from Klever's truck, and that he then approached Klever's truck and "immediately learned" from Klever that he was "driving on a suspended license." Despite Klever's burden to prove that a seizure occurred, the trial court did not make any findings—nor did Klever's trial attorney elicit testimony or propose any such findings—that there was something about the deputy's question, or the manner in which it was asked, that was coercive. On this record, similar to the circumstances in *Thorn*, we are unable to conclude that Klever was seized when he was asked his name and whether his license was still suspended.

For similar reasons, Klever's reliance on *Johnson* and *Sum* is misplaced. In *Johnson*, two uniformed officers stood on opposite sides of Johnson's vehicle, effectively preventing him from driving away, and used flashlights to peer into the vehicle. 8 Wn. App. 2d at 744. One of the officers asked Johnson whether the vehicle belonged to another individual and then asked Johnson for his name and identification. *Id*. In *Sum*, an officer approached Sum's vehicle, asked him who owned the car, and then, when Sum answered unconvincingly, asked him for his identification. 199 Wn.2d at 633. When Sum responded by asking the officer why he wanted Sum's identification, the officer informed Sum that he was in an area "known for stolen vehicles" and that Sum did not seem to know who owned his car. *Id*. In both cases, the trial court's findings were sufficient to establish that a reasonable innocent person would believe that the vehicle, and by extension its driver, was the subject of an ongoing criminal investigation. Thus, the Supreme

10

Court and this court, respectively, concluded that the officer's explanation in *Sum* and the officer's question in *Johnson* were "the tipping point at which the weight of the circumstances transformed a simple encounter into a seizure." *Id*. at 655; *Johnson*, 8 Wn. App. 2d at 745.

Here, in contrast, the trial court's findings are insufficient to establish such a tipping point. Instead, as in *Thorn*, the trial court's findings are capable of more than one interpretation: Klever's interpretation, which is that Deputy Strand's question regarding the status of his license was accusatory and coercive and therefore transformed the encounter into a seizure; and the State's interpretation, adopted by the trial court, which is that Deputy Strand "immediately learned from the Defendant that he [was] driving on a suspended license" and did nothing to create a coercive environment such that Klever reasonably believed he could not leave. Without additional facts, such as those that are missing in *Thorn* or those that are surveyed or present in *Sum* and *Johnson*, the record is insufficient to prove that Klever was seized. Because Klever failed to meet his burden of proof on this point, we affirm the trial court's ruling denying his motion to suppress.

**B.    Public Trial Right**

Next, Klever argues that his public trial right was violated by the trial court's failure to record or memorialize several sidebars that occurred during jury selection. We agree.

"Article I, section 22 of the Washington Constitution and the Sixth Amendment to the United States Constitution guarantee a defendant the right to a public trial. A public trial right violation may be raised for the first time on appeal."

11

*State v. Karas*, 6 Wn. App. 2d 610, 617, 431 P.3d 1006 (2018). To determine whether a defendant's right to a public trial has been violated, we engage in a three-part inquiry: (1) whether the public trial right has been implicated; (2) if so, whether there was a closure of the courtroom that is not de minimis; and (3) if so, whether the closure was justified. *Id*. at 617-18. The burden rests with the appellant to satisfy the first two inquiries and with the proponent of the closure to satisfy the third. *State v. Effinger*, 194 Wn. App. 554, 560, 375 P.3d 701 (2016). "Whether an accused's constitutional public trial right has been violated is a question of law reviewed de novo." *Karas*, 6 Wn. App. 2d at 617.

Our Supreme Court has been clear: *proper* sidebars do not implicate the public trial right and thus fail on the first inquiry. *See State v. Smith*, 181 Wn.2d 508, 514-20, 334 P.3d 1049 (2014). To determine whether a proceeding implicates the public trial right, the court applies the experience and logic test. *Id*. at 514. "'The first part of the test, the experience prong, asks whether the place and process have historically been open to the press and general public. The logic prong asks whether public access plays a significant positive role in the functioning of the particular process in question.'" *Id*. (citing *State v. Sublett*, 176 Wn.2d 58, 73, 292 P.3d 715 (2012)). "To avoid implicating the public trial right, sidebars must be limited in content to their traditional subject areas, should be done only to avoid disrupting the flow of trial, and must either be *on the record or be promptly memorialized in the record*." *Id*. at 515 n.10 (emphasis added).

Here, at least four of the sidebars that occurred during jury selection were neither recorded nor promptly memorialized. At the end of jury selection, the trial

court stated "I want to make a record." Then, the court noted, "I have this peremptory challenge log, which I've dated and signed so I'm going to have that filed as a part of the record to reflect the challenges that were made." The court further stated that the number of jurors had been miscounted and so the fourteenth juror had been dismissed. Though this was likely an attempt to memorialize one of the sidebars,[2] it was neither prompt nor clearly related to the other four sidebars. Thus, Klever has met his burden to show that these were not proper sidebars. And because these were not proper sidebars, it necessarily follows that Klever's public trial right was implicated.

The State argues, "all the sidebars dealt with logistical matters and did not involve taking testimony or proffering evidence." The fatal flaw in this argument is that nobody actually knows what the topic of each sidebar was because none of them was recorded and only one of them was potentially memorialized. The State relies on *State v. Love*, 183 Wn.2d 598, 354 P.3d 841 (2015), and *State v. Anderson*, 194 Wn. App. 547, 377 P.3d 278 (2016), in support of this argument, but the court in *Love* knew what topic had been discussed in both sidebars, 183 Wn.2d at 607, and the proceedings in *Anderson* were memorialized on the record, 194 Wn. App. at 552-53. That did not occur here.

It is equally clear that the sidebars were closures and the closures were not de minimis. Our Supreme Court has described two types of closures. The first type occurs "'when the courtroom is completely and purposefully closed to

---

[2] Immediately before that sidebar, the trial court announced the members of the jury (a total of 14 people) and then asked for counsel to approach. After a sidebar, the court immediately stated "[a]ll right. Little recalculation here. I'm going to thank and excuse Juror No. 27."

spectators so that no one may enter and no one may leave.'" *Love*, 183 Wn.2d at 606 (quoting *State v. Lormor*, 172 Wn.2d 85, 93, 257 P.3d 624 (2011)), and the second type occurs when "a portion of a trial is held someplace 'inaccessible' to spectators, usually in chambers." *Id*. (citing *Lormor*, 172 Wn.2d at 93). When, as in this case, a defendant's public trial right is implicated by a sidebar and no record or memorialization exists to indicate the topic of the sidebar, the sidebar must be considered a closure. The sidebars were inaccessible to spectators and remain inaccessible to reviewing courts and parties on appeal because they were unrecorded. The practical effect of conducting unrecorded and unmemorialized sidebars inside the courtroom is the same as if the same sidebars had been conducted in a judge's chambers.

A closure is de minimis "when [the] closure *implicates* the values underlying the public trial right—when it involves proceedings to which that right attaches— but does not *undermine* those values to an extent that warrants the remedy of automatic reversal." *State v. Schierman*, 192 Wn.2d 577, 610, 438 P.3d 1063 (2018). The values underlying the public trial right include "ensuring a fair trial, reminding the prosecutor and judge of their responsibility to the accused and the importance of their functions, encouraging witnesses to come forward, discouraging perjury, promoting confidence in the judiciary, and providing an outlet for the public's concern, outrage, and hostility." *Id*. at 609 (internal alterations and quotation marks omitted).

Here, Klever has satisfied his burden of showing that at least one of the closures at issue was not de minimis. In his briefing, Klever argues persuasively

that one of the sidebars appears to have addressed a peremptory strike regarding juror 18. The trial court's peremptory strike log indicates that Klever struck juror 18. On the record, the trial court addressed a series of peremptory strikes and then stated "One moment. If counsel can approach, please?" The report of proceedings then states "(Sidebar was had.)" Shortly thereafter, the trial court announced the jurors who would be serving on the panel, and juror 18 was among them. Thus, it appears from the report of proceedings that Klever's peremptory strike regarding juror 18 was discussed and either withdrawn or denied at sidebar.

It is equally clear that this issue—the peremptory strike of a potential juror—implicates and potentially undermines several values underlying the public trial right. When discussing whether to apply the de minimis standard to proceedings that involved for-cause challenges to jurors, our Supreme Court noted, "the proceeding at issue here implicated several of the concerns underlying the right to a public trial: public jury selection (including for-cause challenges) contributes to oversight of the lawyers and the judge, reminding them of the significance of their duties and serving as a check on their biases; promotes confidence in the judiciary; and serves as an outlet for community concern." *Schierman*, 192 Wn.2d at 611. In *Love*, the court similarly recognized, "Our prior cases hold it 'well settled that the right to a public trial . . . extends to jury selection' and we reaffirm that the right attaches to jury selection, including for cause and peremptory challenges." 183 Wn.2d 598, 605 (quoting *State v. Brightman*, 155 Wn.2d 506, 515, 122 P.3d 150 (2005)). Thus, Klever has shown, as he must to prevail on this argument, that the closures were not de minimis.

The cases cited by the State do not indicate otherwise. In *Effinger*, for example, the trial court memorialized all of the sidebars on a case information sheet. 194 Wn. App. at 558-59. Here, in contrast, there is an unexplained discrepancy regarding a matter of significant public importance. In *Schierman*, our Supreme Court held that "the doctrine of de minimis error can apply to the proceeding at issue in this case, which involved no juror questioning, witness testimony, or presentation of evidence." 192 Wn.2d at 614. The court in *Schierman* did not hold that the proceeding before it *was* de minimis for these stated reasons. Instead, it held that the proceeding was *subject to a de minimis analysis* for those reasons. This understanding is reinforced by the fact that the very next sentence in the opinion states, "We also hold, for the reasons given below, that the closure at issue here was a de minimis error. . . ." *Id*. Here, in contrast, Klever has satisfied his burden to show that the closures were not de minimis. On this record, both *Effinger* and *Schierman* are inapposite.

The third and final public trial inquiry asks whether the closure at issue was justified. "A closure unaccompanied by a *Bone-Club* analysis on the record will almost never be considered justified." *Smith*, 181 Wn.2d at 520 (citing *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995)). A *Bone-Club* analysis weighs whether the proponent of the closure made a showing of a compelling interest, whether the parties were given the opportunity to object, whether the method of closure is the least restrictive, whether the order was too broad in application or duration, and whether the competing interests of the proponent of the closure outweighs the interests of the public. 128 Wn.2d at 258-59. In the present case,

16

the trial court failed to engage in any such analysis regarding any of the five sidebars. Therefore, the State has failed to show that the closures were justified.

In short, because Klever has shown that his public trial right was implicated, that the proceedings constituted closures, and that the closures were not de minimis, and because the State has not shown that the closures were justified, we hold that Klever's public trial right was violated. Consistent with precedent, reversal is required. *See, e.g., Karas*, 6 Wn. App. 2d at 627 ("Considering all, the closure cannot be characterized as de minimis. Reversal is required.").

## C. Imposition of LFOs

Lastly, Klever argues that remand to the trial court is necessary to strike the $500 VPA and community custody supervision fees from his judgment and sentence. Klever contends that recent amendments to RCW 7.68.035 provide that the VPA shall not be imposed against a defendant who is indigent at the time of sentencing. LAWS OF 2023, ch. 449, § 1. Citing *State v. Ellis*, 27 Wn. App. 2d 1, 530 P.3d 1048 (2023), and *State v. Wemhoff*, 24 Wn. App. 2d 198, 519 P.3d 297 (2022), Klever similarly argues that RCW 9.94A.345, as recently amended, "no longer authorizes the imposition of community custody fees." The State does not dispute that Klever is indigent and does not object to a remand for purposes of striking the VPA and community supervision fees from his judgment and sentence.

We accept the State's concessions and, accordingly, remand to the trial court to strike the VPA and community custody supervision fees.

**III**

Because the trial court erred in concluding that Klever "was not seized prior to arrest," we affirm the trial court's order denying Klever's motion to suppress. But because the trial court violated Klever's public trial right, we reverse and remand for further proceedings consistent with this opinion. Lastly, we remand to the trial court to strike the VPA and community custody supervision fees.

_Feldman, J._

WE CONCUR:

_Chung, J._                    _Bowman, J._